```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE EASTERN DISTRICT OF TEXAS
 2                      MARSHALL DIVISION

 3   INTELLECTUAL VENTURES, II, LLC,  ()
                                      ()
 4   PLAINTIFF                        ()
                                      ()  CIVIL CASE NO.
 5   VS.                              ()  2:16-CV-980-JRG
                                      ()  MARSHALL, TEXAS
 6   FEDEX CORP., FEDERAL EXPRESS     ()
     CORP., FEDEX GROUND PACKAGE      ()
 7   SYSTEM, INC., FEDEX FREIGHT,     ()
     INC., FEDEX CUSTOM CRITICAL,     ()
 8   INC., FEDEX OFFICE AND PRINT     ()
     SERVICES, INC., AND GENCO        ()
 9   DISTRIBUTION SYSTEM, INC.,       ()  May 18, 2018
                                      ()  8:15 A.M.
10   DEFENDANTS                       ()

11

12                  TRANSCRIPT OF JURY TRIAL
              BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP
13               UNITED STATES CHIEF DISTRICT JUDGE

     APPEARANCES:
14   FOR THE PLAINTIFF:   Mr. Alan S. Kellman
                          Ms. Lauren M. Nowierski
15                        Mr. Jordan N. Malz
                          Mr. Adam D. Steinmetz
16                        Ms. Jennifer M. Przybylski
                          Mr. Kyle G. Petrie
17                        DESMARAIS LLP
                          230 Park Avenue
18                        New York, New York 10169

19   COURT REPORTER:      Ms. Shelly Holmes, CSR, TCRR
                          Official Court Reporter
20                        United States District Court
                          Eastern District of Texas
21                        Marshall Division
                          100 East Houston
22                        Marshall, Texas 75760
                          (903) 923-7464
23

24
     (Proceedings recorded by mechanical stenography, transcript
25   produced on a CAT system.)
```

```
 1    FOR THE PLAINTIFF:  Mr. William E. Davis, III
                          Mr. Christian J. Hurt
 2                        THE DAVIS FIRM, P.C.
                          213 North Fredonia
 3                        Suite 230
                          Longview, Texas 75601
 4
      FOR THE DEFENDANTS: Mr. Gerald F. Ivey
 5                        Ms. Aliza George Carrano
                          FINNEGAN, HENDERSON, FARABOW,
 6                        GARRETT & DUNNER, LLP
                          901 New York Avenue, N.W.
 7                        Washington, D.C. 20001

 8                        Mr. Jeffrey A. Berkowitz
                          Mr. Elliot C. Cook
 9                        Mr. Michael V. Young, Sr.
                          Mr. John Derek McCorquindale
10                        Mr. Daniel C. Tucker
                          Mr. Joseph M. Schaffner
11                        Mr. Alexander M. Boyer
                          FINNEGAN, HENDERSON, FARABOW,
12                        GARRETT & DUNNER, LLP
                          Two Freedom Square
13                        11955 Freedom Drive
                          Suite 800
14                        Reston, Virginia 20190-5675

15                        Mr. Eric Findlay
                          Mr. R. Brian Craft
16                        FINLAY CRAFT, P.C.
                          102 North College Avenue
17                        Suite 900
                          Tyler, Texas 75702
18

19

20

21

22

23

24

25
```

1                  P R O C E E D I N G S

2               (Jury out.)

3               COURT SECURITY OFFICER:  All rise.

4               THE COURT:  Be seated, please.

5               Everybody has their demonstratives prepositioned

6    where they want them?

7               MR. KELLMAN:  Yes, Your Honor.

8               MR. IVEY:  Yes, Your Honor.

9               THE COURT:  All right.  Once the boards go up on

10   the easel, is that going to end up, the corner of it, in

11   Mr. Berkowitz's lap, or how is it going to be, spacing wise?

12              MR. KELLMAN:  Sorry, Your Honor.  I was trying to

13   move it over as much as I -- I moved it up just a little bit

14   to try to make sure it doesn't wind up in his lap.  I hope

15   the position is okay.

16              THE COURT:  All right.  Well, if necessary, he can

17   move an inch or two.

18              MR. KELLMAN:  My intention is not to harm anybody

19   in the process.

20              THE COURT:  Not in a physical sense.

21              MR. KELLMAN:  Certainly.

22              THE COURT:  All right.  All right.  Everything

23   looks -- everything looks acceptable to me.

24              Before I bring the jury in, I want to mention to

25   those present, particularly those in the gallery, that in

1    the Court's view, the Court's final charge to the jury and

2    counsel's final and closing arguments are the most important

3    and the most serious part of a very serious proceeding.

4    Therefore, I do not want people shifting around in their

5    seats getting up, coming out, and letting the door open and

6    close and slam.  I don't want papers being crinkled or

7    passed.

8              In other words, ladies and gentlemen, I want as

9    much quiet and decorum as possible.  Nothing that would

10   interfere with or interrupt or detract from the

11   communications from the Court and from counsel to the jury

12   during this final phase of the trial itself.

13             So if you need to leave for any reason, now is the

14   time to leave.  Otherwise, I'd like everybody to stay seated

15   and be as respectful and as quiet as possible throughout

16   this process.

17             If counsel are ready to proceed, then I see no

18   other -- no reason not to bring in the jury, and I'll begin

19   with my final jury instructions.

20             Is there anything from Plaintiff or Defendant

21   before we do that?

22             MR. KELLMAN:  No, Your Honor.

23             MR. IVEY:  No, Your Honor.

24             THE COURT:  All right.  Mr. Kellman, do you want

25   some kind of a warning on your time with regard to your

1    closing?

2            MR. KELLMAN:  I would like to have 15 minutes and

3    to reserve 15 minutes, but I don't need a warning for the

4    beginning part.  For the latter part, if you could give me a

5    three-minute warning before it's all over that would be --

6            THE COURT:  All right.  I will tell you in your

7    closing when you've reached 15 minutes.  And in your -- and

8    in your second closing, I will tell you when you have three

9    minutes remaining.

10           MR. KELLMAN:  Thank you, Your Honor.

11           THE COURT:  Mr. Ivey, what about you?

12           MR. IVEY:  Five minutes, Your Honor, please.

13           THE COURT:  I'll let you know when you have five

14   minutes remaining.

15           All right.  Let's bring in the jury, please,

16   Mr. Johnston.

17           COURT SECURITY OFFICER:  All rise.

18           (Jury in.)

19           THE COURT:  Good morning, ladies and gentlemen.

20   Welcome back.  Please have a seat.

21           Ladies and gentlemen of the jury, I'll now

22   instruct you on the -- on the law that you must apply in

23   this case.  It's your duty to follow the law as I give it to

24   you.  However, as I've mentioned, you, the jury, are the

25   sole judges of the fact, and accordingly you should -- of

1   the facts -- accordingly, you should not consider any

2   statement that I've made during the trial or that I make in

3   these instructions as an indication that I have any opinion

4   about the facts in this case.

5          I want you all to understand that when you retire

6   to the jury room, you're each going to have your own printed

7   copy of these final jury instructions that I'm giving you

8   orally now.  If you would like to take notes, you may, but

9   given that you will have your own individual printed copies,

10  you may elect simply to listen to me orally and not take

11  notes.  But I wanted you to be aware of that.

12         After I give you these instructions, the attorneys

13  in the case are going to make their closing arguments.

14         Statements and arguments of the attorneys are not

15  evidence, and they are not instructions on the law.  They're

16  intended only to assist you, the jury, in understanding the

17  evidence and the parties' contentions.

18         A verdict form has been prepared for you.  You'll

19  take this form to the jury room, and when you have reached a

20  unanimous agreement as to your verdict, you'll have your

21  foreperson fill in the blanks reflecting that unanimous

22  agreement, date the form, and sign it.  Then advise the

23  Court Security Officer that you have reached a verdict.

24         Answer each question in the verdict form from the

25  facts as you find them to be.  Do not decide who you think

1   should win the case, and then answer the questions to reach

2   that result.  Let me remind you, your answers and your

3   verdict must be unanimous.

4           In determining whether any fact has been proven in

5   this case, you may, unless otherwise instructed, consider

6   the testimony of all the witnesses, regardless of who may

7   have called them, and all the exhibits that have been

8   admitted into evidence, regardless of who may have produced

9   them or introduced them.  You may also consider any

10  stipulations received into evidence.  A stipulation is an

11  agreement.  You must accept a stipulated fact as evidence

12  and treat that fact as having been proven here in court.

13          Now, when I allow testimony or other evidence to

14  be introduced over the objection of an attorney, the Court

15  did not indicate any opinion as to the weight or effect of

16  that evidence.

17          And as I've stated before, you, the jury, are the

18  sole judges of the credibility and believability of all the

19  witnesses and the weight and effect, if any, to be given to

20  all the evidence.

21          Now, if I sustained an objection to a question

22  that was addressed to a witness, then you, the jury, must

23  disregard the question entirely, and you may draw no

24  inference from its wording or speculate about what the

25  witness would have said if I had allowed he or she to answer

1    the question.

2            At times during the trial, it's been necessary for

3    me to talk to the lawyers here at the bench outside of your

4    hearing or by calling a recess and talking to them when you

5    were not in the courtroom.

6            We did this because often during trials, things

7    arise that do not involve the jury.  You should not

8    speculate about what was said during any discussions that

9    were had outside of your presence.

10           Certain exhibits were shown to you during the

11   trial which were call trial illustrations, charts, or

12   summaries.  These types of exhibits are called demonstrative

13   exhibits or simply demonstratives.  Demonstratives are a

14   party's description, picture, or model to describe something

15   involved in the trial. If your recollection of the evidence

16   differs from the demonstratives, you should rely on your

17   recollection.

18           Please be aware that demonstratives, which are

19   sometimes called jury aids, are not themselves evidence.   A

20   witness's testimony about a demonstrative, however, is

21   evidence.

22           In deciding the facts in this case, you may have

23   to decide which testimony to believe or which testimony not

24   to believe.  You may believe every -- you may believe

25   everything a witness says, part of it, or none of it at all.

1          In considering the testimony of any witness, you

2     may take into account things like the following:

3          (1) the opportunity and ability of the witness to

4     see or hear or know the things that he or she testified

5     about;

6          (2) the witness's memory;

7          (3) the witness's manner while testifying;

8          (4) the witness's interest in the outcome of the

9     case and any bias or prejudice;

10         Next, whether other evidence contradicted that

11    witness -- any witness's testimony;

12         Next, the reasonableness of the witness's

13    testimony in light of all the evidence and any other factors

14    that bear on whether the witness is or isn't believable.

15         Proof of a fact does not necessarily depend on the

16    number of witnesses who testify about it.

17         Remember, a simple mistake by a witness does not

18    necessarily mean that the witness did not tell the truth as

19    he or she remembers it.  People may forget things or

20    remember other things inaccurately.  If a witness has made a

21    misstatement, consider whether that misstatement was an

22    intentional falsehood or simply an innocent mistake.  The

23    significance of that may depend on whether it has to do with

24    an important fact or only an insignificant detail.

25         Even though a witness may be a party to an action

1    and therefore interested in its outcome, the testimony may

2    be accepted if it's not contradicted by direct evidence or

3    by any inference that may be drawn from the evidence if you

4    believe the testimony of that witness.

5          As I mentioned at the beginning of the trial,

6    there are two burdens of proof that you will apply in this

7    case.  They are the preponderance of the evidence and clear

8    and convincing evidence.

9          A preponderance of the evidence means evidence

10   that persuades you that a claim is more probably true than

11   not true.

12         Clear and convincing evidence means evidence that

13   produces in your mind an abiding conviction that the claim

14   or defense is highly probable.  Although proof to an

15   absolute certainty is not required, the clear and convincing

16   evidence standard requires a greater degree of persuasion

17   than is necessary for the preponderance of the evidence

18   standard.

19         Now, certain testimony throughout the trial has

20   been presented to you in the form of video clips which come

21   from what we call a deposition.  As I mentioned in my

22   preliminary instructions, a deposition is the sworn recorded

23   answers to questions asked to a witness under oath in

24   advance of the trial.  Under some circumstances if a witness

25   cannot be personally or physically present to testify in

1    open court, that witness's testimony may be presented under

2    oath in the form of a deposition.

3         Some time before the trial began, attorneys

4    representing both sides of the case questioned the witness

5    under oath.  A court reporter and often a videographer were

6    present and recorded those questions and answers.  The

7    deposition testimony is entitled to the same weight and

8    consideration and should otherwise be considered insofar as

9    possible by you in the same way as if the witness had been

10   present and testified in person in open court from the

11   witness stand.

12        Now, when knowledge of a technical subject may be

13   helpful to you, the jury, a person who has special training

14   or experience in that technical or economic field, which we

15   call an expert witness, has been permitted to testify and

16   state his or her opinions on those technical or economic

17   matters.  However, ladies and gentlemen, you're not required

18   to accept those opinions from any expert witness.  As with

19   any other witness, it's up to you to decide whether to rely

20   upon it or not.

21        In this case, Intellectual Ventures and all

22   entities included among the FedEx Defendants are separate

23   corporations.  While for convenience, we've referred to

24   FedEx collectively, and I'll continue to do so for the

25   purposes of these instructions, as I explained to you

1    earlier, the named Defendants are, in fact, seven -- seven

2    distinct corporations or companies.

3           A parent corporation is not always liable for the

4    actions of its subsidiaries, including patent infringement.

5    However, a parent corporation may be liable where the parent

6    directs or controls the other entity's performance or

7    whether two entities form a joint enterprise.  You should

8    thus treat as distinct each separate corporation for each

9    claim, issue, and defense.

10          Also, as in the trial, whether I refer in these

11   instructions to the Plaintiff, IV or Intellectual Ventures,

12   each of these references means Intellectual Ventures II LLC,

13   which is the Plaintiff.

14          Intellectual Ventures contends that FedEx

15   infringes certain claims of the patents-in-suit.  As I told

16   you in my preliminary instructions, when the parties -- and

17   I refer to FedEx collectively -- when I refer to FedEx

18   collectively, I'm referring to the Defendants, which are

19   FedEx Corp, Federal Express Corp, FedEx Ground Package

20   System, Inc., FedEx Freight, Inc., FedEx Custom Critical,

21   Inc., FedEx Office and Print Services, Inc., and GENCO

22   Distribution System, Inc.

23          Now, remember, there are four patents-in-suit, and

24   they are United States Patent No. 6,909,356, which you've

25   heard referred to throughout the trial as the '356 patent;

1    U.S. Patent No. 7,199,715, which you've heard referred to

2    throughout the trial as the '715 or the '715 patent; U.S.

3    Patent 8,494,581, which you've heard referred to throughout

4    the trial as the '781 (sic) or the '781 (sic) patent; and

5    U.S. Patent No. 9,047,586, which you've heard referred to

6    throughout the trial as the '586 patent.

7           Now, the claims that Intellectual Ventures are

8    asserting for the patents-in-suit are referred to as the

9    asserted claims, and those claims are Claim 1 of the '356

10   patent; Claims 1 and 4 of the '715 patent; Claims 1, 18, 20

11   and 20 (sic) of the '581 patent; Claim 7 of the '586 patent.

12          Intellectual Ventures alleges infringement against

13   the FedEx Defendants as follows:

14          That FedEx directly infringes the '356 patent.

15   That FedEx -- excuse me, that FedEx Freight directly

16   infringes the '356 patent, that FedEx Corp induces FedEx

17   Freight to infringe the '356 patent.

18          That FedEx Freight and GENCO directly infringe the

19   '715 patent.  That FedEx Corp induces FedEx freight to

20   infringe the '715 patent.

21          That FedEx Corp, FedEx Ground, and FedEx Express

22   directly infringe the '581 patent, either themselves or

23   through those they control.

24          That FedEx Corp, FedEx Ground, FedEx Express, and

25   FedEx Office directly infringe the '586 patent, either

1    themselves or by other -- or through others they control.

2    That FedEx Corp, FedEx Ground, and FedEx Express induced

3    customers to infringe the '586 patent.

4         Intellectual Ventures also seeks money damages

5    from FedEx for allegedly infringing the patents-in-suit.

6         Intellectual Ventures contends that certain of the

7    FedEx companies named in this case infringe the

8    patents-in-suit by making or using or actively inducing

9    others to make or use products, systems, and devices that

10   Intellectual Ventures argues are covered by the asserted

11   claims.  These products, systems, and devices are called the

12   accused instrumentalities.  They're sometimes called the

13   accused products.

14        For some of the accused instrumentalities,

15   Intellectual Ventures contends that FedEx Corp's and FedEx

16   Freight's infringement is willful.

17        FedEx denies that any of the companies named in

18   this case infringe the asserted claims.

19        FedEx denies that any of the companies named in

20   this case make or use any of the accused instrumentalities

21   that infringe any of the asserted claims.

22        FedEx further denies that any of the companies

23   named in this case actively induce others to infringe by

24   making or using the accused instrumentalities.

25        FedEx Corp and FedEx Freight further deny that any

1    alleged infringement is willful.

2         FedEx contends that all of the asserted claims are

3    invalid.

4         Intellectual Ventures denies that any of the

5    asserted claims are invalid.

6         Your job as jurors will be to decide whether

7    Intellectual Ventures has proven in each instance that the

8    specifically accused FedEx companies named in the case

9    infringe any of the asserted claims and whether FedEx has

10   proven that any of the asserted claims are invalid.

11        If you decide that an asserted claim is infringed

12   and is not invalid, you'll then need to decide the amount of

13   money damages to be awarded to Intellectual Ventures as

14   compensation for that infringement.

15        At the beginning of the trial, I gave you some

16   general information about patents and the patent system and

17   a brief overview of the patent laws relevant to this case.

18        I'll now give you more detailed instructions about

19   the patent laws that relate to this case.

20        Before you can decide many of the issues in this

21   case, you'll need to understand the role of the patent

22   claims.  The patent claims are the numbered sentences at the

23   end of the patent.

24        The claims are important because it's the words of

25   the claims that define what a patent covers.  The figures

1    and the text and the rest of the patent provide a

2    description or examples of the invention, and they provide a

3    context for the claims, but it is the claims that define the

4    breadth of the patent's coverage.  Each claim is effectively

5    treated as if it were a separate patent, and each claim may

6    cover more or cover less than another claim.

7            Therefore, what a patent covers depends, in turn,

8    on what each of its claims covers.

9            As I explained in my preliminary instructions,

10   this case involves two types of patent claims, independent

11   claims and dependent claims.

12           An independent claim sets forth all the

13   requirements that must be met in order to be covered by that

14   claim.  Thus, it's not necessary to look to any other claim

15   to determine what an independent claim covers.

16           However, a dependent claim does not itself recite

17   all the requirements of the claim but refers to another

18   claim for some of its requirements.  In this way, the claim

19   depends on another claim.

20           A dependent claim incorporates all of the

21   requirements of the claims to which it refers or from which

22   it depends.  The dependent claim then adds its own

23   additional requirements.

24           So to determine what a dependent claim covers,

25   it's necessary to look at both the dependent claim and any

1   other claims to which it refers or from which it depends.

2          As a result, if you find that an independent claim

3   is not infringed, you must also find that its dependent

4   claims are not infringed.

5          On the other hand, if you find that an independent

6   claim has been infringed, you must still separately decide

7   whether the additional requirements of its dependent claims

8   have also been infringed.

9          Now, by the same token, even if you find that an

10  independent claim is invalid, its dependent claims may still

11  be valid.  Each patent claim sets forth in words a set of

12  requirements in a single sentence.

13         The requirements of a claim are usually divided

14  into parts or steps which we call limitations.  Sometimes we

15  call them elements.

16         If a device, system, method, or instrumentality

17  satisfies each of these requirements in the claim's

18  sentence, then it is said that the device, system, method,

19  or instrumentality is covered by the claim, falls under the

20  claim, or infringes the claim.

21         For example, a claim that covers an invention of a

22  table may recite a tabletop, four legs, and the glue that

23  secures the legs to the tabletop.  In this example, the

24  tabletop, legs, and glue are each separate limitations or

25  elements of the claim.

The beginning portion or the preamble of the claim often uses the word "comprising."  The word "comprising," as used in the preamble, means including or containing.  When comprising is used in the preamble, a device that includes all the limitations or elements of the claim, as well as additional elements, is covered by the claim.

For example, a claim to a table comprising a tabletop, four legs, and glue would be infringed by a tabletop that includes -- excuse me -- by a table that includes a tabletop, four legs, and glue even if the table also includes wheels to go on the ends of the four legs.

If a device is missing even one limitation or element of a claim, it does not meet all the requirements of a claim and is not covered by the claim.  And if a device is not covered by a claim, it does not infringe that claim.

You first need to understand each claim term in order to decide whether or not there is infringement of a claim and to decide whether or not the claim is invalid.

The law says that it's my role to define the terms of the claims, and it's your role to apply my definitions or constructions to the issues that you're asked to decide in this case.

For any words in the claims for which I have not provided you with a definition, you should apply their plain and ordinary meaning.  My interpretation of the language

1    should not be taken by you as an indication that I have a

2    view regarding the issues of infringement and validity.  The

3    decisions regarding infringement and validity, I remind you,

4    are yours to make.

5         During your deliberations you must apply these

6    meanings which are also set forth in your juror notebooks,

7    the ones that I have given you.

8         I'll now instruct you on the specific rules that

9    you must follow to determine whether the Plaintiff,

10   Intellectual Ventures, has proven that certain of the

11   Defendant companies named in this case have infringed by

12   direct and/or indirect infringement one or more of the

13   claims; that is, Claim 1, 18, and 20 of the '581 patent,

14   Claim 7 of the '586 patent, Claim 1 of the '356 patent,

15   Claims 1 and 4 of the '715 patent.

16        Now, to prove infringement of any claim, the

17   Plaintiff, Intellectual Ventures, must persuade you that it

18   is more likely than not that each of the FedEx companies, as

19   accused, has infringed that claim.

20        You must decide whether the Defendant has made or

21   used within the United States an instrumentality covered by

22   the asserted claims.  You must compare each claim to each

23   accused instrumentality accused of infringing that claim to

24   determine whether every requirement of the claim is included

25   in or performed by that accused instrumentality.

1          The claims are not limited to any one or more

2     examples, therefore, you should not compare FedEx's

3     activities accused of infringement with any specific

4     examples set out in the patents or to any preferred

5     embodiment of the claimed inventions presented at trial.

6          The only correct comparison, ladies and gentlemen,

7     is to compare the accused products with the language of the

8     asserted claims themselves, using the meanings and

9     definitions that I have given you.

10         To prove direct infringement, Intellectual

11    Ventures must prove by a preponderance of the evidence that

12    each of the FedEx companies named in this case has made or

13    used within the United States accused instrumentalities that

14    include each and every limitation of an asserted claim.

15         There are two types of direct infringement:

16    Literal infringement and infringement under the Doctrine of

17    Equivalents.

18         I'll also describe below how literal infringement

19    and infringement under the Doctrine of Equivalents are also

20    used to assess direct infringement of means-plus-function

21    claims and in situations where the acts of one party are

22    legally attributable to another.

23         In determining whether an accused instrumentality

24    literally infringes a claim, you must compare the accused

25    instrumentality with each requirement recited in the claim.

1          A claim requirement is present if it exists in an

2     accused instrumentality as I have explained the language of

3     the requirement to you, or if I did not explain it, as it

4     would have been understood by one of skill in the art.

5          If an accused instrumentality omits even a single

6     requirement of a claim, then you must find the accused

7     instrumentality does not literally infringe the claim.

8          You must determine separately for each claim and

9     for each accused instrumentality whether or not there is

10    infringement by the specific FedEx companies in this case

11    that have been accused of infringing that claim.

12         I'll now explain infringement under the Doctrine

13    of Equivalents.

14         The Plaintiff, Intellectual Ventures, accuses that

15    FedEx -- the FedEx Defendants infringe Claims 1 and 4 of the

16    '715 patent under the Doctrine of Equivalents.

17         If a person practices a method that does not meet

18    all the requirements of a method claim and thus does not

19    literally infringe that claim, or if a person makes or uses

20    an instrumentality that does not meet all the requirements

21    of a claim and thus does not literally infringe that claim,

22    there can still be direct infringement if that method or

23    instrumentality satisfies the claim under the Doctrine of

24    Equivalents.

25         Under the Doctrine of Equivalents, a method or

1    instrumentality infringes a claim if the accused method or

2    instrumentality performs steps or contains elements

3    corresponding to each and every requirement of the claim

4    that is equivalent to, even though not literally met by, the

5    accused method or instrumentality.

6            You may find that a step or element is equivalent

7    to a requirement of a claim that is not met literally if a

8    person having ordinary skill in the field of technology of

9    the patent would have considered the differences between

10   them to be insubstantial or would have found that the action

11   or structure performs substantially the same function in

12   substantially the same way to achieve the substantially same

13   result as the requirement of the claim.

14           In order for the action or structure to be

15   considered interchangeable, the action or structure must

16   have been known at the time of the alleged infringement to a

17   person having ordinary skill in the field of technology of

18   the patent.  Interchangeability at the present time is not

19   sufficient.  In order to prove infringement by equivalents,

20   the Plaintiff, Intellectual Ventures, must prove the

21   equivalency of the actions or structure to the claim or

22   element -- to a claim element by a preponderance of the

23   evidence.

24           Some of the asserted claims include requirements

25   that are in a means-plus-function form.  Those have been

1  identified in the claim construction provided above, namely

2  that Claims 18 and 20 of the '581 patent where I've

3  interpreted the function and corresponding structure for

4  each means-plus-function claim term.

5       An instrumentality or method meets a means-plus --

6  means-plus-function requirement if, one, it has a structure

7  or set of structures that perform the function recited in

8  the claim, and, two, that structure is either the same or

9  equivalent to the described structures that I have defined

10  earlier as performing the claimed function.

11       If the accused instrumentality does not perform

12  the specific function recited in the claim as I have

13  interpreted it, the means-plus-function requirement is not

14  met, and the accused instrumentality does not literally

15  infringe the claim.

16       Alternatively, even if the product has a structure

17  that performs the function recited in the claim but the

18  structure is not the same as or equivalent to the structures

19  that I've defined to you for performing that function, the

20  accused instrumentality does not literally infringe the

21  asserted claim.

22       A structure may be found to be equivalent to one

23  of the structures I have defined as being described in the

24  patent if a person having ordinary skill in the field of

25  technology of the patent would have considered the

1   differences between them to be insubstantial at the time the

2   patent was filed, or if that person would have found the

3   structures perform the function in substantially the same

4   way to achieve substantially the same result.

5          In deciding whether the differences would be

6   insubstantial, you may consider whether a person having

7   ordinary skill in the field of the patent would have known

8   that the two structures were interchangeable.

9          For some of the accused instrumentalities, you

10  must decide whether the making and using of the accused

11  instrumentality by one of the FedEx entities or by FedEx

12  customers is attributable to one or more of the FedEx

13  entities.

14         For a method claim, direct infringement occurs

15  when all the steps of the method are attributable to a

16  single entity.  To determine whether a step is attributable

17  to an entity, you must consider the step in the context of

18  all the facts presented.

19         The law holds a party responsible for other's

20  performance of method steps where the party controls or

21  directs the other's performance of the method steps or where

22  the party and the performer of the method steps form a joint

23  enterprise.

24         A party is liable for infringement when the

25  parties -- when the party conditions another person's or

1    entity's participation in an activity or receipt of a

2    benefit upon that person or entity's performance of a step

3    or steps of a patented method and establishes the manner or

4    timing of that performance.

5           For example, a party is responsible for another

6    party's infringement if the party profits from the

7    infringement and has the right and ability to stop or limit

8    the infringement, such as by acting as the headquarters.  In

9    other words, if a party receives the benefits that follow --

10   that flow -- that follow from practicing a step, then the

11   step may be attributable to it.

12          For a system or apparatus claim, a party may be

13   liable to -- for another party or entity's use of the

14   accused instrumentality if the party puts the claimed

15   invention into service, which is to say that the party

16   controls the system and obtains benefit from it.

17          A party may be a direct infringer for using a

18   system when the party exercises control of the system and

19   obtains benefit from the use of a system.

20          And for a system or apparatus claim, a party is

21   considered to have made an instrumentality if it acts

22   through its agents under the party's direction or control to

23   make the instrumentality.

24          A party may be liable for another person or

25   entity's use of the accused instrumentality if the party

1    puts the entire claimed invention into service so that the

2    party controls the system and obtains benefit from it.

3           Intellectual Ventures alleges indirect

4    infringement in this case as follows:

5           That FedEx Corp is liable for indirect

6    infringement of the '356 and '715 patents by actively

7    inducing FedEx Freight to directly infringe the asserted

8    claims of those patents.

9           That FedEx Corp, FedEx Ground, and/or FedEx

10   Express are each liable for indirect infringement of the

11   '586 patent by actively inducing its customers to directly

12   infringe the asserted claims of the '586 patent.

13          As with direct infringement, you must determine

14   induced infringement on a claim-by-claim basis.

15          FedEx Corporation is liable for induced

16   infringement of a 3 -- of a '356 patent or '715 patent claim

17   if Intellectual Ventures proves by a preponderance of the

18   evidence that:

19          (1) the acts have been carried out by FedEx

20   Freight and directly infringe the claim;

21          (2) FedEx Corporation has taken action intending

22   to cause the infringing acts by FedEx Freight;

23          And, (3), FedEx Corporation has been aware of the

24   '356 patent or '715 patent and has known that the acts of

25   FedEx Freight constitute infringement of the '356 or '715

1    patent or was willfully blind to that infringement.

2           FedEx Corp, FedEx Ground, and/or FedEx Express are

3    liable for induced infringement of the '586 patent claim

4    only if Intellectual Ventures proves that:

5           (1) the acts have been carried out by customers

6    and directly infringe the claim;

7           (2) FedEx Corp, FedEx Ground, and/or FedEx Express

8    has taken action intending to cause the infringing acts by

9    its customers;

10          And, (3), FedEx Corp, FedEx Ground, and/or FedEx

11   Express has been aware of the '586 patent and has known that

12   the acts of its customers constitute infringement of the

13   '586 patent or was willfully blind to that infringement.

14          To establish induced infringement, it's not

15   sufficient that someone else directly infringes a claim, nor

16   is it sufficient that the company accused of inducing

17   another's direct infringement merely had knowledge or notice

18   of an asserted patent or had been aware of the acts that

19   allegedly constitute direct infringement.  And the mere fact

20   that the company accused of inducing another's direct

21   infringement had known or should have known that there was a

22   substantial risk that someone else's acts would infringe is

23   not sufficient.  Rather, in order to find inducement, you

24   must find that the company accused of inducing another's

25   direct infringement specifically intended or was willfully

1  blind to that infringement.

2          In this case, for the '356 and '715 patents,

3  Intellectual Ventures contends both that the FedEx -- that

4  FedEx has infringed and further that FedEx Corp and FedEx

5  Freight have infringed willfully.

6          If you've decided that FedEx Corp and FedEx

7  Freight have infringed the -- the '356 and/or '715 patents,

8  you must go on and address the -- the additional issue of

9  whether or not this infringement was willful.

10          Willfulness requires you to determine whether

11  Intellectual Ventures has proven that it is more likely than

12  not that the infringement by FedEx Corp and FedEx Freight

13  was egregious under the circumstances.

14          You may not determine that the infringement was

15  willful just because FedEx Corp and FedEx Freight knew about

16  the patents and infringed them.  Rather, to show

17  willfulness, you must find that FedEx Corp and/or FedEx

18  Freight engaged in additional conduct evidencing deliberate

19  or reckless disregard for the Plaintiff's patent rights such

20  as where infringement is malicious, deliberate, and

21  consciously wrongful, or done in bad faith, and typified by

22  willful misconduct.

23          You may also find that FedEx Corp and/or FedEx

24  Freight's actions were egregious or willful if FedEx Corp

25  and/or FedEx Freight acted in reckless or callous disregard

1   of or with indifference to the rights of Intellectual

2   Ventures.

3           A Defendant is indifferent to the rights of

4   another when it proceeds in disregard of a high and

5   excessive danger of infringement that is known to or should

6   be apparent to the reasonable person in the Defendants'

7   position.

8           Now, to determine whether FedEx Corp and FedEx

9   Freight acted willfully, consider all the facts in this

10  case.  These may include but are not limited to:

11          (1) Whether or not FedEx Corp and FedEx Freight

12  reasonably believed they did not infringe or that the

13  patents were invalid;

14          (2) whether or not FedEx Corp and FedEx Freight

15  made a good-faith effort to avoid infringing the patents;

16          (3) whether or not FedEx Corp and FedEx Freight

17  tried to hide or cover up their infringement.

18          Now, to prove willful infringement, Intellectual

19  Ventures must persuade you that FedEx Corp and FedEx Freight

20  infringed a valid claim of the '356 or '715 patents with

21  respect to the automated components of the Freight 2020

22  system.  The requirements for proving such infringement were

23  discussed in my prior instructions.

24          FedEx contends that the asserted claims are

25  invalid as anticipated or obvious in view of the prior

1   patents or other publications.

2        I'll now instruct you on the rules that you must

3   follow in deciding whether or not FedEx has proven that any

4   of the asserted claims of the patents-in-suit are invalid.

5        To prove that any claim of a patent is invalid,

6   FedEx must persuade you by clear and convincing evidence

7   that the claim is invalid.

8        During the course of the trial, FedEx has

9   presented you with some prior art that was and some prior

10  art that was not considered by the United States Patent and

11  Trademark Office during prosecution of the asserted patents.

12       FedEx contends that such prior art invalidates

13  certain claims of the asserted patents.

14       In deciding the issue of invalidity, you may take

15  into account whether the prior art was or was not considered

16  by the PTO when it issued the asserted claims.

17       Like infringement, ladies and gentlemen,

18  invalidity is determined on a claim-by-claim basis.  You

19  must decide separately for each asserted claim whether FedEx

20  has proven that the claim is invalid.  If one claim of a

21  patent is invalid, that does not mean that any other claim

22  is necessarily invalid.

23       For example, even if an independent claim is

24  invalid, this does not mean that the dependent claim that

25  depends from it were automatically invalid.  Rather, you

1  must consider the validity of each claim separately.

2          However, if you find that a dependent claim is

3  invalid, then you must find that the independent claim from

4  which it depends is also invalid because the dependent claim

5  includes all of the elements of the independent claim from

6  which it depends.

7          Claims are construed the same way for determining

8  infringement as for determining invalidity.

9          In the patent laws, a system, device, method,

10 publication, or patent that predated the patent claims at

11 issue is called prior art.

12         Prior art may include any of the following items

13 received into evidence during the trial:

14         (1) any product, system, or method that was

15 publicly known or used by others in the United States before

16 the patented invention was made;

17         (2) patents that issued before the filing date of

18 the patent or before the invention was made.

19         (3) publications having a date before the filing

20 date of the patent or before the invention was made.

21         (4) any product, system, or method that was in

22 public use or on sale in the United States before the patent

23 was filed;

24         (5) any product, system, method that was made by

25 anyone before the named inventors created the patented

1    product, system, or method where the product, system, or

2    method was not abandoned, suppressed, or concealed.

3           Now, in this case, the relevant date of the

4    invention is the same as the earliest filing date for each

5    of the patents.  And for each of the patents, that date is

6    as follows:

7           For the '356 patent, the date is November the 3rd,

8    2000.

9           For the '715 patent, the date is March the 1st,

10   2005.

11          For the '581 patent, the date is September the

12   18th, 2000.

13          And for the '586 patent, the date is May the 30th,

14   2001.

15          Now, a number of issues relevant to invalidity

16   must be viewed from the perspective of an ordinary person --

17   excuse me, from a person of ordinary skill in the art in the

18   field of the asserted -- in the field of the asserted

19   invention as of the effective filing dates above.

20          Because the parties disagree on the definition of

21   a person of ordinary skill in the art for each of the

22   patents-in-suit, you must consider each party's proposed

23   definition as presented during the trial for each patent and

24   adopt one of the party's definitions when considering

25   invalidity.

1          As to the '586 patent, one of the differences is

2   whether or not a person of ordinary skill in the art has

3   relevant experience in the field of barcode technology.

4          Now, in order for someone to be entitled to a

5   patent, the invention must be new.  An invention is new when

6   the identical system or method has not been made, used, or

7   disclosed before.  If an invention is not new, it is

8   considered to be anticipated.  Anticipation must be

9   determined on a claim-by-claim basis.

10          FedEx contends that some of the asserted claims

11  are invalid because the claimed invention is anticipated.

12  FedEx must convince you of that by clear and convincing

13  evidence.

14          For purposes of this case, an invention is

15  anticipated if it was already patented or described in a

16  printed publication anywhere in the world before the date of

17  the invention.  For the claim to be invalid because of

18  anticipation, FedEx must show that all of the requirements

19  of that claim were described in a single previous printed

20  publication or patent.

21          To anticipate the invention, the prior art does

22  not have to use the same words as in the claim but all the

23  requirements of the claim must have been disclosed; that is,

24  either stated expressly or implied to a person having

25  ordinary skill in the art of the field of technology of the

1    invention so that looking at that one reference, that person

2    could make and use the claimed invention.

3            Furthermore, the prior art must contain all of the

4    limitations of the claim arranged as in the claim.

5            If you find that FedEx has proven by clear and

6    convincing evidence that a claim was anticipated, as I've

7    explained the law to you, you must find that claim is

8    invalid.  If you find that FedEx has failed to prove by

9    clear and convincing evidence that a claim was anticipated,

10   you must find that claim is not anticipated and is not

11   invalid.

12           In order to be patentable, in addition to being

13   new, the invention must also be nonobvious.  This means it

14   would not have been obvious to a person of ordinary skill in

15   the field of the technology of the patent at the time the

16   invention was made.

17           To find that prior art rendered an invention

18   obvious, do not use hindsight.  In other words, you should

19   not consider what a person of ordinary skill in the art

20   would know today or what has been learned from the teachings

21   of the patents.

22           In this case, FedEx contends that all the asserted

23   claims are invalid as obvious.  The ultimate conclusion on

24   whether a claim is obvious will be based on your

25   determination of several factual issues.

1          These include:

2          (1) You must decide the level of ordinary skill in

3    the field of the technology of someone -- that someone would

4    have had at the time the claimed invention was made.

5          (2) You must decide the scope and content of the

6    prior art.  In determining the scope and content of the

7    prior art, you must decide whether a reference is pertinent

8    or analogous to the claimed invention.

9          Pertinent -- pertinent or analogous prior art

10   includes prior art in the same field of the endeavor as the

11   claimed invention, regardless of problems addressed by the

12   reference and prior art in different fields reasonably

13   pertinent to the particular problem with which the claimed

14   invention is concerned.  Remember that prior art is not

15   limited to patents and published materials but includes the

16   general knowledge that would have been available to one of

17   ordinary skill in the field of the invention.

18         (3) You must decide what differences, if any,

19   existed between the claimed invention and the prior art.

20         (4) You should also take into account any

21   objective evidence that Intellectual Ventures properly

22   advanced that may -- properly advances that may have existed

23   at the time of the invention that may shed light on the

24   obviousness or not of the claimed invention.  Such objective

25   evidence includes:

1                (a) whether the claimed invention was commercially

2      successful as a result of the merits of the claimed

3      invention;

4                (B) whether the invention satisfies a long-felt

5      need;

6                (C) whether others in the field praised the

7      invention;

8                (D) whether others sought or obtained rights to

9      the patent from the patentholder.

10               But such objective evidence considerations are

11     relevant only if there is a connection, or nexus, between

12     the factor and the invention covered by the patent claims.

13     If you conclude that objective evidence indicators have been

14     established, those factors should be considered along with

15     all the other evidence in the case in determining whether

16     the FedEx Defendants have proven that the claimed invention

17     would have been obvious.

18               Although you should consider evidence of these

19     factors, the relevance and importance of any of them to your

20     decision about whether the claimed invention would have been

21     obvious is up to you.

22               The existence of every claim -- or every -- excuse

23     me, the existence of every element of the claimed invention

24     in the prior art does not prove obviousness.  Most, if not

25     all, inventions rely on the building blocks of prior art.

In considering whether a claimed invention is obvious, you should consider whether at the time of the claimed invention there was a reason that would have prompted a person having ordinary skill in the field of the technology of the patent to combine the known elements in the way that the claimed invention does, taking into account such factors as:

(1) whether the claimed invention was merely the predictable result of using the prior art elements according to their known functions;

(2) whether the claimed invention provides an obvious solution to a known problem in a relevant field;

(3) whether the prior art teaches or suggests the desirability of combining elements claimed in the invention;

(4) whether the prior art teaches away from combining elements in the claimed invention;

(5) whether it would have been obvious to try the combination of elements such as where there is a design need or market pressure to solve a problem, and there are a finite number of identified, predictable solutions; and

(6) whether the change resulted more from design incentives or other market forces.

If you find that FedEx has proven by clear and convincing evidence that a claim was obvious, as I've explained the law to you, you must find that claim invalid.

1        If you find that FedEx has failed to prove by

2   clear and convincing evidence that a claim was obvious, you

3   must find that claim is not invalid.

4        If you find that FedEx has infringed any valid

5   claim, you must then consider what amount of damages to

6   award to Intellectual Ventures.  If you find that one of the

7   FedEx Defendants has infringed a valid claim of an asserted

8   patent, then you must consider what amount of money damages

9   to award to Intellectual Ventures for those acts of

10  infringement.

11       I'll now instruct you about the measure of

12  damages, but by instructing you on damages, ladies and

13  gentlemen, I'm not suggesting which party should win this

14  case, on any issue.

15       The damages you award must be adequate to

16  compensate Intellectual Ventures for infringement.  Your

17  damages award should put Intellectual Ventures in

18  approximately the same financial position that it would have

19  been in had infringement not occurred.

20       You may not add anything to the amount of the

21  damages to punish an accused infringer, to set an example,

22  or for willful infringement, if any.  You may not add

23  anything to the amount of the damages for interest.

24       Intellectual Ventures has the burden to establish

25  the amount of its damages by a preponderance of the

evidence.  In other words, you should award only those damages that Intellectual Ventures establishes it more likely than not suffered.

While the Plaintiff is not required to prove the amount of its damages with mathematical precision, it must prove them with reasonable certainty.  Intellectual Ventures is not entitled to damages that are remote or speculative.

However, the determination of a damages award is not an exact science, and the amount need not be proven with unerring precision.  You may approximate, if necessary, the amount to which Intellectual Ventures is entitled.  In such case, while the damages may not be determined by mere speculation or guess, it is proper to award a damages amount if the evidence shows the extent of the damages as a matter of just and reasonable inference.

However, I remind you that the damages must be grounded in the evidence presented at trial.

The patent laws specifically provide that damages for infringement may not be less than a reasonable royalty.

In this case, Intellectual Ventures seeks a reasonable royalty.  A royalty is a payment made to a patentholder in exchange for the right to make, use, or sell the claimed invention.  This right is called a license.

A reasonable royalty is the payment for the license that would have resulted from a hypothetical

negotiation between the patentholder and the alleged infringer taking place at a time when the infringing activity first began.

In considering this hypothetical negotiation, you should focus on what the expectations of the patentholder and the infringer would have been had they entered into an agreement at that time and had they acted reasonably in their negotiations.

In determining this, you must assume that both parties believed the patents-in-suit were valid and infringed and that both parties were willing to enter into an agreement.

You should also presume that the parties had full knowledge of the facts and circumstances surrounding the infringement at the time of the hypothetical negotiation.

It's your role to determine what the result of that negotiation would have been.  The test for damages is what royalty would have resulted from the hypothetical negotiation and not simply what either party would have preferred.

Evidence of things that happened after infringement first began can be considered in evaluating the reasonable royalty only to the extent that the evidence aids in assessing what royalty would have resulted from a hypothetical negotiation.

1    In this case, the parties generally agree on when

2 and between whom the hypothetical negotiations for each of

3 the patents-in-suit would have taken place.

4    The parties disagree on whether the hype --

5 hypothetical negotiation for each of the patents-in-suit

6 would have resulted in a single lump-sum royalty for the

7 life of the patents or a running royalty.

8    A reasonable royalty can be a single lump-sum

9 amount, or it can be a percentage properly attributed to

10 infringing activity.

11    A lump-sum amount is a royalty payment where the

12 patent owner receives a single upfront payment.

13    A running royalty is a royalty where the patent

14 owner collects ongoing per unit or percentage payments over

15 a period of time.

16    In determining the reasonable royalty, you should

17 consider all the facts known and available to the parties at

18 the time the infringement began.  Some of the kinds of

19 factors you may consider in making your determination are

20 the value that the claimed invention contributes to the

21 accused product, the value that factors other than the

22 claimed invention contribute to the accused

23 instrumentalities, and comparable license agreements, such

24 as those covering the use of the claimed invention or

25 similar technology.

1            Additional factors you may consider, which are
2     sometimes called the Georgia-Pacific factors, include the
3     following:
4            (1) the royalties received by Intellectual
5     Ventures for licensing of the patents-in-suit, proving or
6     tending to prove an established royalty;
7            (2) the rates paid by the FedEx Defendants for the
8     use of other patents comparable to the patents-in-suit;
9            (3) the nature and scope of the license as
10    exclusive or non-exclusive or as restricted or
11    non-restricted in terms of territory, or with respect to
12    whom the manufactured property may be sold;
13           (4) Intellectual Ventures's established policy and
14    marketing program to maintain its patent monopoly by not
15    licensing others to use the invention or by granting
16    licenses under special conditions designed to preserve that
17    monopoly;
18           (5) the commercial relationship between
19    Intellectual Ventures and the FedEx Defendants, such as
20    whether they are competitors in the same territory, in the
21    same line of business, or whether they are inventor and
22    promoter;
23           (6) the effect of selling the patented specialty
24    in promoting sales of other products of the FedEx Defendants
25    and the extent of such derivative or convoyed sales;

1          (7) the duration of the patent and the term of the
2 license;

3          (8) the established profitability of the product
4 made under the patents, its commercial success, and its
5 current popularity;

6          (9) the utility and advantages of the patented
7 property over the old modes or devices, if any, that had
8 been used for working out similar results;

9          (10) the nature of the patented invention and the
10 benefits to those who have used the invention;

11          (11) the extent to which the FedEx Defendants have
12 made use of the invention and any evidence probative of the
13 value of that use;

14          (12) the portion of the profit or of the selling
15 price that may be customary in the particular business or in
16 comparable business to allow for the use of the invention or
17 analogous inventions;

18          (13) the portion of the realizable profits that
19 should be credited to the invention as distinguished from
20 non-patented elements, the manufacturing process, business
21 risks, or significant features or improvements added by the
22 FedEx Defendants;

23          (14) the opinion and testimony of qualified
24 experts;

25          (15) the amount that a licensor, such as

1   Intellectual Ventures, and a licensee, such as the FedEx

2   Defendants, would have agreed upon at the time infringement

3   began if both had been reasonably and voluntarily trying to

4   reach an agreement -- that is, the amount which a prudent

5   licensee who desired as a business proposition to obtain a

6   license to manufacture and sell a particular article

7   embodying the patented invention would have been willing to

8   pay as a royalty and yet be able to make a reasonable profit

9   and which amount would have been accept -- acceptable by a

10  prudent patentee which was willing to grant a license.

11          This final factor establishes the framework which

12  you should use in determining a reasonable royalty -- that

13  is, the payment that would have resulted from a negotiation

14  between the patentholder and infringer taking place at a

15  time prior to when infringement began.

16          Now, ladies and gentlemen, no one of these factors

17  is dispositive, and you can and should consider the evidence

18  that has been presented to you in this case on each of these

19  factors.

20          You may also consider any other factors which in

21  your mind have increased or decreased the royalty the

22  infringer would have been willing to pay and the

23  patentholder would have been willing to accept acting as --

24  acting as normally prudent business people.

25          All right.  Ladies and gentlemen, we'll now

1    proceed to hear closing arguments from the attorneys in the

2    case.

3           The Plaintiff will present its first closing

4    statement at this time.

5           Mr. Kellman, you may present your first closing

6    statement.

7           MR. KELLMAN:  Thank you, Your Honor.

8           Good morning, ladies and gentlemen.

9           When I stood before you on Monday earlier in this

10   week, I told you that we were here this week in this

11   courtroom because FedEx infringes four United States patents

12   but refuses to take responsibility for that infringement.

13          I told you that we would bring you expert

14   witnesses to look at the products, compare them to the

15   claims of the patent and to the Court's claim constructions,

16   and explain why FedEx infringes.

17          I also told you that FedEx would not take

18   responsibility, that you would hear excuses.  And that is

19   exactly what has happened in this case.

20          Throughout this case, FedEx paraded witnesses up

21   into that witness stand, expert witnesses into that witness

22   stand who ignored the Court's claim constructions, ignored

23   what Judge Gilstrap told them the claims mean.

24          That is not following the rules.  That is not

25   taking responsibility.

1           Now, before I go through the evidence and show you
2     how we proved this case, I want to take a moment to thank
3     you for your time.  I know this takes a lot out of your
4     lives.  Everyone here really does appreciate it.  And, you
5     know, I'm going to say it again when we finish, but we
6     really do appreciate all of your attention throughout all of
7     the long days that we've spent here.
8           So let's go through the evidence.
9           I showed you in opening this slide.  This is
10    Figure 6 from Mr. Barbosa's patent.  And I described to you
11    exactly how it works.
12          You have your mobile device.  It gets instructions
13    from the assessment program that's back at the home office,
14    sends instructions to the mobile, the mobile sends that
15    information back that it collects and tracks GPS.  No one
16    disagrees on how that works.  And, in fact, no one disagrees
17    that FedEx does exactly that process.
18          Here it is.
19          FedEx trucks leave the station, they get the
20    instructions from the assessment program, the instructions
21    from the back end, and it tells them where to go.  They go
22    to each stop.
23          And as we learned, they can even, while they're on
24    the road out there, get changes to it so that you can change
25    one of the stops.  That is accessing the assessment program

1    the way the Court has construed it and the way Dr. Sharony

2    took you through it, and there really is no serious

3    disagreement with that.

4            The only real disagreement that FedEx says is that

5    Dr. Sharony drew this computer wrong up here.  And we heard

6    Mr. Williams tell you that he thought that there were

7    actually lots of different computers here and that wouldn't

8    meet the limitations of the claim.  But that's not what the

9    '581 patent says.

10           Mr. Williams, when he was up here, wasn't looking

11    at the patent.  He was just making it up.  Let me show you.

12           As Dr. Sharony told you, the very first words of

13    the patent, the very first words in the abstract on the

14    front cover say:  Communication from enterprise servers.

15           That's the computing device that we're talking

16    about.  Enterprise servers.  FedEx is an enterprise, it uses

17    those servers.

18           And we spent plenty of time hearing from witnesses

19    such as FedEx's David Smith, who told you that multiple

20    computers, the physical computer, still are considered one.

21    They're one computing device.

22           So we asked -- I asked him this question:  And the

23    dispatch work station, even though it's made up of lots of

24    different servers, it's one box there?

25           That's correct.

1          And then we talked about the communication back

2     and forth.

3          And there are two arrows, one going to the

4     dispatch work station and one going to the PowerPad?

5          And that's correct.

6          Everything comes right back in to the same set of

7     computers which is that computing device.  What Mr. Williams

8     was confusing, he -- Mr. Williams told you that this -- that

9     you had to send it back to the same software program.  But

10    that's not what the claim says, ladies and gentlemen.  The

11    claim says it comes back to the computing device, the set of

12    servers that the patent talks about.  Doesn't go back to the

13    same program.  It's just wrong.  It's not following the

14    rules.  It's not following the claim.

15         So let's see what Mr. Williams said -- said.

16         Mr. Williams said:  Well, if you don't believe my

17    non-infringement, I think it's invalid.

18         Now, remember what Mr. Ivey told you in the

19    opening.  He told you that FedEx actually did it first.  But

20    we learned that that's not true.

21         When I asked Mr. Williams about it:  The

22    SuperTracker and the Enhanced SuperTracker, those didn't get

23    manifests like the current product does, right?

24         He says:  Correct.

25         Same thing with the DADS handheld.

1          Mr. Bailey, which you remember was their very

2    first witness, Mr. Bailey didn't tell us about manifests

3    coming to the DADS handheld, right?

4          I don't believe so.

5          And he said:  Yes, you're agreeing with me.

6          And then I said, and this is the key piece:  So in

7    order to invalidate Claim 1 or Claim 18, you would have to

8    show that there were some kind of instruction or task list

9    going to the handheld device and something being done in

10   response to that -- because that's what the claim said?

11         And he agreed with me.

12         And Mr. Bailey didn't provide any of that?

13         I believe so, correct.

14         That's it.  It's over.  The FedEx prior art

15   systems did not do Mr. Barbosa's patent, and their own

16   expert witness admitted it.

17         Now, because the FedEx prior art systems didn't do

18   it, Mr. Williams then took us through a whole bunch of other

19   things that he thinks would have been added and would have

20   been obvious to put together before.  Remember, FedEx didn't

21   think that.  FedEx, the company who has been innovating in

22   this field forever, didn't think of Mr. Barbosa's patent

23   before he did.

24         So what Mr. Williams said is, well, take all of

25   these things over here that FedEx did, combine them with

1   another patent, and then maybe if you put all that together,

2   FedEx would have thought of it.  But he didn't go that -- he

3   didn't stop there.

4          There was no GPS, and GPS, everyone -- there was

5   some disagreement about whether you had to do GPS in Claim

6   1.  Put that aside.  Claim 18 requires that, and that's why

7   they brought this Gildea patent.  That has nothing to do

8   with FedEx, this Gildea patent.

9          So Mr. Williams said, we'll add Gildea.

10         And then he said, well, for Claim 20, we've got to

11  add this Khalessi patent.

12         Mr. Barbosa invented the technology that's used in

13  this case, and FedEx is trying to take it away from him by

14  saying, don't just look at what we did, but add to that

15  this, and add to that that, and add to that a fourth one,

16  and if you put all of those four different inventors

17  together, maybe you have what Mr. Barbosa did.

18         Mr. Barbosa did the work of all of these other

19  people.  That's inventive, and you can't take his patent

20  away from him.

21         Let's look at the next patent.

22         This is Mr. Baych's patent.  It's the '586 patent.

23  And he explained to you that the invention was not inventing

24  barcodes.  Barcodes were well-known.  Not inventing shipping

25  labels.  Those were well-known.  Everyone knew about it.

1          What it was, was sending an electronic document

2     with these barcodes, and that was the common language to go

3     from one computer application, one piece of software, to

4     another piece of software with the barcodes.  That way you

5     could talk in common.  That's what Mr. Baych told you.

6          And, again, everyone agrees that FedEx uses this

7     Common Label Service to do that.

8          Common Label Service goes to all of these

9     applications, and it sends an electronic document.  There's

10    no dispute about that in this case.  They infringe.

11         So who did FedEx bring?  FedEx brought Mr. Ackley

12    to say, oh, no, no, there's no infringement.

13         But Mr. Ackley sat here and wasted your time,

14    ladies and gentlemen.  Why?  He didn't follow the rules

15    either.

16         I asked him:  So we spent, what, two hours

17    listening to you testify and not once have you mentioned one

18    of the Court's claim constructions?

19         That's correct.

20         So throughout your entire non-infringement

21    analysis, not one reference to the Court's claim

22    construction, right?

23         Yes.

24         And he said exactly the same thing for his

25    invalidity analysis.

1          He wasn't doing what he's supposed to do.  That's

2     not how you prove non-infringement and invalidity.  That's

3     how you make excuses.

4          Here's the first excuse.  This is -- this is what

5     Mr. Ackley actually told you.  He told you that when you --

6     there are no data tags in this barcode because -- actually,

7     I'm not even sure I understand it.  Dr. Engels told you that

8     this Position 1 is a data tag because when there's a 1 in

9     it, according to FedEx's own documents, that means FedEx

10    Express.  And when there's a 9 in it, that means FedEx

11    Ground.  That's FedEx's own document right there.

12         And the claim term requires that you have to

13    encode the same -- the tag and the barcode -- excuse me, the

14    tag and the data in the same barcode.  There it is.  It's

15    right there.

16         If Mr. Ackley had actually followed the Court's

17    claim construction and known that you were supposed to put

18    them all in the same barcode, he wouldn't have given you his

19    non-infringement analysis.

20         Here's the other argument that Mr. Ackley made.

21         Mr. Ackley told you that you can't print the

22    label.  That makes no sense.  The whole idea of the patent

23    is to send electronically a barcoded document from one

24    application to another and then print it.  That's exactly

25    what Mr. Baych told you.

1          And we asked him:  Are your claims limited to only

2    scanning barcodes from electronic screens?

3          No, the claims are not limited at all.

4          No one challenged that when he said it.

5          Mr. Ackley, instead, went through this complicated

6    process of comparing two patents, and it's a printed -- I

7    didn't even understand that.

8          But he at least admitted at the end:  There are no

9    words that say:  Don't print.

10         Agreed?

11         Answer:  There are no words that say don't print

12   in the patent in that claim.

13         You can't add extra limitations to the claim.  And

14   if he'd looked at the Court's claim constructions, he would

15   know that.

16         Mr. Ackley also told you that the patent was

17   invalid.  And he relied on this ANSI standard.  And he said

18   the Patent Office didn't know about that.

19         Okay.  The Patent Office may not have known about

20   the specific document that they found, but an identical

21   document was talked about in the patent by the inventors.

22   It talked about two barcodes here.  It talked about the EDI,

23   the electronic data interchange.  The inventors actually

24   said you can use this to practice my invention.

25         So think about that.  The inventors told the world

1    that you can use a shipping label with multiple barcodes on

2    it to practice their invention.

3              That is actually telling you why FedEx infringes,

4    not that it's invalid.  And the Patent Office granted that

5    patent.  That argument makes no sense to Mr. Ackley.

6              Finally, Mr. Ackley told you that FedEx came up

7    with it first.  Also not true because we asked Mr. Bailey

8    who was their first witness.

9              And I said to him:  So what the interNetShip

10   document -- that's the prior art they say did it first --

11   what that's telling customers was that the shipping label is

12   generated and displayed on the customer's computer?

13             It isn't sent from anywhere.  The customer's

14   computer generates and displays the shipping label.  That

15   does not meet the important limitation of the claim of

16   sending an electronic document.  It comes right out of their

17   documents.  Mr. Bailey said it, and Mr. Ackley simply

18   ignored the actual evidence.

19             So it can't be invalid.  You cannot take away

20   Mr. Baych's patent on that evidence.

21             Finally, we get to the RFID tags, and the RFID

22   tags have to do with two different products, the GENCO

23   product, which is the return of the pharmaceuticals that we

24   heard about.  Dr. Engels, who is here with us, went through

25   in detail, and it took a little while because there are a

1   lot of constructions, walked through all of the Court's

2   claim constructions and showed you how the RFID reader and

3   the barcode reader and the other reader all the way at the

4   end do the GENCO -- the GENCO process actually infringes

5   those claims of tracking at multiple successive points.

6           Now, Dr. Rhyne came in and Dr. Rhyne told you that

7   no, no, no, there's actually only one reader here.  That

8   reader doesn't exist.

9           But when I cross-examined him, I cross-examined

10  him and he saw that other witnesses had said from FedEx that

11  there were two barcode readers -- excuse me, two RFID

12  readers, and, in fact, another handheld one, and he had to

13  admit that on the stand.

14          Then I pointed out to him:  Dr. Rhyne, you're

15  forgetting about the first part of Dr. Engels's opinion,

16  which is that the tracking begins when they generate the

17  label at the office.  They scan it there.

18          And he said:  Yeah, but when I was saying that

19  Dr. Engels was wrong, I -- I didn't take into account the

20  beginning part of his opinion.  I just started at arrival.

21          THE COURT:  15 minutes have been used.

22          MR. KELLMAN:  Thank you, Your Honor.

23          That is not a non-infringement argument, ladies

24  and gentlemen.  That is just ignoring the evidence.

25          Now, let's talk about FedEx Freight.  FedEx

1  Freight -- you saw that there -- FedEx Freight uses RFID.

2  There's no dispute about that.

3         So what was the dispute?  Dr. Engels took you

4  through the video and showed you how data is changed as you

5  go through on the forklift.  He showed you that it first

6  says:  Load to B310.  And then in the video it says:  Load

7  to D310.  The data changes, which is what the evidence --

8  excuse me, what the claim requires, and that's exactly what

9  Dr. Engels showed you.

10         Dr. Rhyne came in and started talking about a

11  button and whether people press it.  That is his entire

12  opinion.  You heard us go back and forth on that.  But

13  that's not what's required, and that's not what Dr. Engels

14  said.  The data changes.  There's really no dispute about

15  it.  And no one has said otherwise.  That's infringement,

16  and it's -- and it's willful infringement.

17         It's willful infringement because we know that

18  FedEx did this after -- after knowing about the patents, and

19  he deliberately did it.

20         Finally, on the '356 patent, this is Dr. Rhyne's

21  big argument, big opinion, that because -- that the forklift

22  and the person on it is not an entity, okay?  He finally

23  looked at the Court's claim construction, but he didn't

24  apply it.

25         This is the defense to willful infringement,

1    ladies and gentlemen.  The defense to willful infringement

2    is that this person sitting on the forklift is not an

3    individual.  Really?  Come on.  That makes no sense.  The

4    forklift is the automated device.  There's also an

5    individual on it.  It meets the Court's claim construction.

6    Dr. Engels took you through it.  That is not a defense to

7    willful infringement.  That is putting your head in the

8    sand.  That is willful infringement.

9        Finally, we had Mr. Wagner put up his damages

10   analysis, and he walked you through how the use was

11   calculated, okay?

12       Unlike Dr. Stiroh, he actually followed the law

13   which requires you to look at FedEx's use of the patented

14   invention, not just what was paid for it.  And there is no

15   dispute about all of these numbers, none at all.

16       Dr. Stiroh did not dispute them.  All she said was

17   what -- you should pay something else.  You should pay what

18   the cost of the patents were.  That is not the law.  The law

19   is we have to look at how much FedEx was infringing, and

20   that's how we calculated it.  And you get to a number at the

21   end, $96,875,000.00 -- $875,975.00.

22       Now, I have to sit down for a few minutes.  I'll

23   have a couple of minutes to come back at the end.  But think

24   about this.  If FedEx really believed -- really believed

25   that it did not infringe and the patents are invalid, then

1   why did it parade witnesses up here who constantly ignored

2   the Court's claim construction?

3           If they really believed that they didn't infringe

4   and it was invalid, why did I have to constantly show these

5   witnesses that they were contradicting their sworn

6   testimony?  As you listen to Mr. Ivey talk about the

7   evidence, think about those two questions.

8           Thank you, Your Honor.

9           THE COURT:  All right.  Defendant, you may present

10  your closing argument.

11          MR. IVEY:  Yes, Your Honor.  We need to retrieve

12  one piece of evidence, and then we'll be ready to go.

13          THE COURT:  We'll take a couple of minutes to

14  transition.

15          MR. IVEY:  Thank you, Your Honor.

16          THE COURT:   All right.  Counsel, you may proceed

17  with your closing argument on behalf of the Defendants.

18          MR. IVEY:  Thank you, Your Honor.

19          And good morning, ladies and gentlemen.

20          We started a few days ago, and I know it feels

21  like longer than that, but it was a few days ago.  And one

22  of the things I told you when we started is that we were

23  going to be spending our time together investigating a

24  number of the claims that have been made by IV in this case,

25  Intellectual Ventures in this case, to meet its burden of

1   proof with regard to proving that with regard to the four

2   patents that are asserted against FedEx, that each and every

3   element of each and every asserted claim has been infringed

4   by something that FedEx has done.

5          We told you at that point in time that through our

6   investigation we would show you where they had left out

7   important details that you are all entitled to know before

8   you retire to deliberate on non-infringement and invalidity.

9          And you saw some of that happen right here as one

10  of the things that's been difficult in this case is the lack

11  of time IV has spent with regard to its own patents, and

12  that's because those claims are well after anything that

13  FedEx has been doing, and we don't do what those patents

14  talk about.

15         Those patents also are not particularly inventive

16  for a number of the reasons that we showed you.

17         Now, summations are really about promises made and

18  promises kept.  And we're going to talk about how FedEx has

19  kept its promises to you and how IV has not.

20         Right off the bat, we started with the opening

21  statement from the Plaintiff in this case where he began by

22  saying, and this was startling, that this case is about the

23  technology that FedEx uses to deliver these packages

24  securely and safely on time.

25         He then goes on to point out, it turns out that

1    doing all of that is actually not an easy task.  He lists

2    the kinds of things that FedEx has to do to make sure it

3    delivers overnight and on time, and he ends by saying at

4    that -- and that presents a bunch of challenges.

5           That's absolutely true, and as I remarked during

6    the opening, my opening, you would have thought from

7    listening to this if you didn't know any better that FedEx

8    had never delivered a parcel or freight until after 2000,

9    the year of the earliest filing date of one of these

10   patents.

11          But, in fact, that's not true.  None of these

12   patents have helped FedEx in any way, and none of these

13   patents provide anything that FedEx has ever needed.

14          Now, we started by showing you that FedEx has a

15   40-year tradition with regard to overnight delivery and

16   on-time delivery.  We are the pioneer with regard to this.

17   We have mastered the techniques of on-time overnight

18   delivery, and we have been recognized for doing so.  We have

19   been in the forefront of overnight package delivery with

20   up-to-date up-to-the-minute tracking of where your packages

21   are throughout the country throughout the days.

22          And we've added a few things to build in from the

23   timeline that we started with on Mr. Smith from 1971, and

24   those include a few items I'll come back to in a little more

25   detail.

1          They begin with the 1999 -- 1996 interNetShip

2     being launched.  We'll also talk very quickly about the 1999

3     Computerworld Award, the Smithsonian award recognizing the

4     innovativeness of interNetShip.  And we'll also talk very

5     briefly about the 2000 patents, the '642 patent that was

6     issued to FedEx, specifically with Mr. Bailey as one of the

7     inventors on that technology, and what that meant with

8     regard to overnight shipment and tracking of packages.

9          Now, with regard to one of the first things here,

10    it's important to keep in mind that with regard to all of

11    the innovations by FedEx, all of these things took place

12    without the help of IV and many of them had been in the

13    works for more than 30 years before these companies even

14    filed for these patents, some of which didn't issue until

15    2005, 2007, 2013, 2015.

16         So we begin with our home-grown technology.  And

17    this has to do with patents -- the '642 patent as we

18    described it to Mr. Tracey Bailey who took the stand and

19    talked to you about his development of this technology,

20    in-house, homegrown at FedEx.

21         And this had to do with the collecting and

22    transmitting of data related to package delivery.  This is

23    right in the strike zone of what FedEx does every day, very

24    different from what we'll show you with regard to the

25    patents that they are now trying to say from IV actually do

1    what we do.

2           And we'll talk about the judicial center video,

3    the patent video, and the Court's instructions with regard

4    to the property boundaries, as you remember them.

5           And you remember that these are like real estate

6    boundaries.  And what you've seen throughout this case is

7    the effort by the lawyers for IV to take the stakes out of

8    the ground of those property boundaries and widen them so

9    far that the patents are no longer recognizable for what

10   they actually did, which has almost nothing to do in any

11   instance with anything FedEx does for parcel and freight

12   delivery.

13          Mr. Bailey talked about the fact, and the patent

14   talks about specifically, before anything from IV, the

15   PowerPad, which included many of the same components of the

16   earlier EST, and that was the Enhanced SuperTracker, one of

17   the devices Mr. Bailey actually built at FedEx.

18          We also talked, and he explained about, COSMOS,

19   which was another technology on behalf of FedEx which was

20   the Customer Operations and Services Master On-line

21   System -- Master On-line System.  That was from 1979, and

22   that is accused in the IV patent with regard to this case,

23   which was filed in 2016.

24          We also talked about the homegrown innovation and

25   recognition of that with regard to the annual report in 1999

1    where it talks about the fact that FedEx interNetShip

2    recently received the prestigious Computerworld Smithsonian

3    Award for its innovative use of technology.

4            Today, with a combination of FedEx PowerShip

5    computers, FedEx's software, and FedEx interNetShip, more

6    than two-thirds of United States domestic shipping

7    transactions are handled electronically.  And there's a big

8    issue here with regard to the idea of printing something

9    down, and they've completely misrepresented what that means

10   with regard to the technology we had all through ANSI and

11   through our own documents with Multicode and interNetShip.

12           What we were talking about is paperless

13   capabilities being able to decode barcodes from the computer

14   screen electronically, sending and receiving them in that

15   format.

16           So we also then get to the point of talking about

17   the four patents in this case.  The issuance date for these

18   is July 2013, for the '581 patent, we don't use that

19   technology.  June 2, 2015, for '586 patent, we don't use

20   that technology.  For the '356 patent, June 21, 2005, we

21   don't use that technology.  And for the '715 patent, April

22   3, 2007, FedEx does not use that technology.

23           None of these patents are infringed, and they are

24   invalid with regard to everything that's been claimed in

25   this courtroom.

1          You should also remember, ladies and gentlemen,

2     that with regard to the issues and the burdens of proof, if

3     there is any element mentioned from the claims that are

4     asserted against the FedEx Defendants, that means that the

5     entire infringement assertion fails, and that is true with

6     regard to each of these patents.

7          We started with the '581 patent, and one of the

8     things we remind you about here is that this was the

9     PalmPilot patent.  And what we had from Mr. Barbosa, the

10     inventor, was an admission on cross-examination, and it is

11     this.

12          In fact, we asked:  Sir, you never built a

13     prototype or device that actually performed the functions

14     claimed by the '581 patent, did you?

15          The answer:  That's correct.

16          And we'll show you the claim here, as we did

17     during the course of the trial, juxtaposed with the Figure 6

18     for the patent.

19          And you'll remember that the key elements of the

20     claim, not the reconfiguration of that through the expert

21     testimony of the witnesses for IV, but the actual claim

22     talked about a handheld device shown highlighted in 10, and

23     a computing device located geographically remote, Figure 8

24     in this particular diagram, and remember Mr. Barbosa's

25     business, he was a singular person for his plumbing and HVAC

1  business interested in providing information, guidance, and

2  instructions to his junior techs in the field from his

3  office.

4         This has nothing to do, nor did he claim it had

5  anything to do with parcel and freight shipment.

6         And, finally, we have in the claim the

7  communicating of the field data collected using the handheld

8  device and the geographical location of the handheld device

9  to the computing device.

10        And we showed you, ladies and gentlemen, how that

11 actually works.  It's a pretty simple loop.  The information

12 goes from 58, the computer, to the handheld device, and the

13 geographical location, the GPS data is sent back to that

14 device.  And ladies and gentlemen, we have proved

15 definitively FedEx does not do this.  It doesn't need to do

16 this.

17        We showed you this by using the ELMO here and

18 pointing out that the PowerPad device here gets

19 information -- you remember those morning manifest from two

20 servers, one was the DWS, the other ROADS, and you'll recall

21 from the witnesses from FedEx and the experts, there was no

22 contradiction on this point.

23        That manifest data comes from servers that are not

24 even in the same state.  There are 20 of these in Colorado,

25 40 of these in Memphis.  They send out the information.  And

1   we made it clear, it was proven, it is uncontroverted that

2   the GPS data, the locational data does not go back to those

3   servers.  It goes somewhere else.

4          Mr. Smith on this particular point, the designer

5   of some of these systems and the supervisor for much of what

6   goes on at FedEx Express.

7          Is the GPS data sent back to DWS?

8          Answer:  It is not.

9          Is the GPS data sent back to ROADS?

10         It is not.

11         Do either ROADS or DWS ever receive GPS data?

12         They do not.

13         Question:  How many servers make up DWS?

14         Approximately 20.

15         And where are those servers located?

16         Colorado Springs.

17         For ROADS, there are approximately 40.  And those

18   are in a hard -- harden facility in Tennessee.

19         Mr. Williams was in sync with this particular

20   point here.

21         In your opinion, sir, are the 61 servers that I

22   just drew the box around -- and you saw that in the slide we

23   just showed you -- one server within the context of the '581

24   patent?

25         The answer:  No.

1              In your opinion, are those DWS servers receiving

2   GPS data at all?

3              Answer:  No.

4              With -- we've talked about another set of servers

5   earlier today for ROADS.  Do those receive GPS data at all?

6              Answer:  No.

7              And the same thing was true with regard to the

8   data for the Ground and FedEx system, which was the Star IV

9   system, where the data came from the APS server and from the

10  VISION server and did not go back to those servers.

11             This is uncontroverted.

12             We then had the '586 patent.  And, again, if

13  you'll notice here, the title here was:  System for Tagged

14  Barcode Data Interchange.  And only Claim 7 was asserted.

15             You just heard the Court give an example during

16  the instructions to you about the idea that the barcode

17  technology was something that a person of skill in the art

18  would be conversant with.  You heard the startling statement

19  by Dr. Engels on behalf of IV that, in fact, that wasn't

20  part of what he thought should be included in his slide with

21  regard to people skilled in the art.  It wasn't even listed.

22  But that's what the patent is about.

23             And when you look at what the claim has here in

24  Claim 7, the claim that's asserted, and what Mr. Baych

25  testified to, there are a number of key points that come up.

1          The first is this.  With regard to electronic

2    documents in Claim 7, Microsoft Word, Microsoft Excel, how

3    to create an electronic document, saving electronic

4    documents to a local hard drive or network hardware, he

5    didn't invent any of that.  That's out from Claim 7.

6          With regard to the next part of this which had to

7    do with barcodes, which he also didn't invent, he was clear

8    he didn't invent barcodes, barcodes scanners, or barcodes

9    fonts.  He didn't invent data tagging, although that's

10   required in Claim 7 here.  He didn't invent emailing the

11   electronic document, sending it anymore.  No evidence that

12   he ever invented or tried to claim inventing email or

13   sending electronic data interchange.

14         So what we have here is they run from the claims,

15   they run from what the patents are about, they run from the

16   property that the people who are the inventors on these

17   patents are entitled to, and they try to move the stakes,

18   move those boundaries so they can cover what FedEx does by

19   looking backwards and saying I've got these patents now in

20   the 2000 time frame, let's see what we can find from FedEx

21   to try to claim infringement.

22         That's not the way this is supposed to work.

23         You heard from Mr. Ackley, the person who actually

24   was able to put barcodes on bees, if you recall, and other

25   things, how this actually works.  And it goes straight to

1    what the figures are with regard to the way our system is

2    developed.

3           Figure 3-1 shows that we have a very specific

4    layout for barcode content.  The FedEx 1D barcode basically

5    has 34 digits.  We have proven there are no data tags in

6    that 34-digit layout.  They simply aren't there, which means

7    we're not infringing this patent because we're not using the

8    process in Claim 7.  There is no infringement.

9           Also, there was a significant point where they

10   pointed out a number of things that have taken place before

11   the '586 patent was ever applied for.  The first two items

12   were in 1996, and those included prior use and prior art,

13   first being the ANSI standard, DTX-219 in evidence.

14          The DTX-254 in evidence referenced to the

15   Multicode guide, which you heard Mr. Grus talk about because

16   he was there at RPS when this guide was developed and

17   disseminated and used.  And then RPS was later acquired and

18   became part of FedEx Ground.

19          And we had the third item here which was

20   interNetShip which was also in 1996 and actually used

21   electronic dissemination of barcode scannable readings here.

22          And we'll talk about each these in a little bit

23   more detail here.

24          First of all, with regard to the fact that all of

25   this stuff came before IV's '586 patent, there's no question

1    about that.

2           With regard to the ANSI reference, there is no

3    question that this guide is from 1996.  There's no question

4    it was not considered by the Patent Office.  The

5    sleight-of-hand you saw with regard to talking about another

6    reference that's in the patent, doesn't mean that this

7    reference was before the patent examiner.  It was not.

8           The second thing we have here, the Multicode

9    Barcode Label Guide, you heard Mr. Grus talk about that in

10   some detail at some length.  Multicode and ANSI were both in

11   1996, before the '586 patent.  They involve and disclose how

12   to use and develop electronic documents with two or more

13   barcodes.  Data tags and data items included among different

14   types of data tags and barcodes.

15          And one of the things that's important to remember

16   about the Multicode guide here is that this was emailed to

17   customers.  And you heard Mr. Grus talk about the fact that

18   RPS had nearly 10,000 customers who received this guide in

19   multiple ways, but one of them was by email.  And this meant

20   that you had emailed to customers a readable series of

21   barcodes as a PDF file within the guide.

22          We also had evidence of prior use from FedEx

23   itself with the -- with the FedEx interNetShip guide.

24   Customers used this on the Internet by 1996, well before the

25   '586 patent.  There were thousands of daily uses of this

1  before that patent came aground for '586.

2      This was the first Internet shipping application.

3  It's the reason it was considered to be innovative by the

4  Computerworld's Smithsonian Award committee.  And it was

5  also not considered by the Patent Office.

6      Now, you then heard Mr. Bailey, one of the

7  inventors on the '642 patent, which was our technology and

8  patented technology at FedEx, talk about the interNetShip

9  barcode.  And what we showed you was proof of how this

10  worked.  Can you explain the interNetShip barcode, how it

11  works to generate airbills?

12      Yes.  So the customers would go to the fedex.com

13  website, and they would enter in their information from

14  their computer using a browser.

15      This is on the computer.

16      They would then enter the information, the FedEx

17  system would generate the document -- the shipping

18  document -- which is still on the computer, it would send

19  that image back to the computer file -- filed through -- the

20  computer filed through the browser to the customer's

21  computer so that they could verify it and print it out.

22      But the scanning and the reading of the barcode

23  was handled electronically.

24      Yes, you could print it later, but you didn't have

25  to print the label to read it, which is what the prior art

1    talked about before we came up with this with interNetShip

2    in 1996.  And, again, four years or more before the '586

3    patent.

4            We then had the '356 patent, and there was

5    something important about both the '356 and '715 that you

6    heard that I want to make sure you caught.  And that was

7    these were referred to as RFID patents.  And, ladies and

8    gentlemen, there's no question that neither of these patents

9    invented RFID.  And we didn't use the technology for either

10   one of these, and we still don't.

11           This was the '356 patent, a method and apparatus

12   for associating the movement of goods with the identity of

13   an individual moving the goods.  This isn't about shipping

14   freight the way that FedEx handles it.

15           Basically what we had was from the Court's claim

16   construction, that was applied by Dr. Engels.  And the only

17   thing he said was relevant here was the only accused item

18   here was the forklift of being an entity.  So the entity is

19   the item that's actually from the claim construction.

20           And the -- ladies and gentlemen, it's clear that

21   forklifts are not automated devices as required in the claim

22   construction.  The forklifts at FedEx require manual

23   operators.  And you now see there's a driver in the forklift

24   because that's the only way we can use them.  The forklift

25   computer does not provide any instructions to the forklift

1   operator.  FedEx does not do what Claim 1 requires.  We

2   don't need to.  There's no point to it.

3           The next thing we had was Ms. Wagner who came and

4   testified before you.  She was an excited and proud employee

5   for FedEx.  One of the things she was asked about here is,

6   is this -- is this -- is this depicted to be a human driver

7   of the forklift?

8           And she said:  Yeah.

9           Question:  Is there any plan to automate the

10  forklift?

11          Answer:  Oh, that would be awesome, but, no, not

12  at this time.

13          The videos that Dr. Engels has tried to rely on

14  are both animations, and they are demonstratives of testing.

15  They are not things that FedEx does now.  There's no

16  controversy with regard to that.  FedEx is not practicing

17  what's required in the '5 -- '356 patent.

18          Now, you also had Dr. Rhyne, who did as was true

19  with each of our witnesses, rely upon the Court's claim

20  construction.  They didn't spend a lot of time talking about

21  them in front of you, but they did with regard to each of

22  their expert opinions and each of their expert reports, and

23  with regard to the testimony rely upon the claim

24  construction.  There's no inconsistency there.

25          And what you have with Dr. Rhyne is a point that

1    I'll come back to in a minute.  We know that he actually

2    visited a FedEx facility to make sure that he actually had

3    real-life on-the-ground expertise with regard to what's

4    happening at FedEx, and not just using a video, an

5    animation, and try to extrapolate from that that everything

6    you've seen in a video shown within the company is somehow

7    or another something that's happening at the docking areas

8    across the country.

9         He confirmed that the forklifts require manual

10   operation by a forklift operator and that the forklift

11   computer does not provide any instructions to the forklift

12   operator.  FedEx does not do what Claim 1 requires.

13        That brings us to '715, the last of the patents.

14   And, again, it's not an RFID invention here.  What it talks

15   about and the key point here is in the claim, we've gone

16   again to the claim for each and every one of these patents.

17        And the point that we're going to focus here on is

18   the idea of modifying part of the information in the

19   database as a function of other information in the database.

20        What this meant was we went straight to the table

21   from the specification and claim -- in Column 6 with Table

22   No. 3, and you remember seeing the empty areas where there

23   had been no read with regard to the tracking of -- of in --

24   inventory down the line.

25        And what happens with regard to the '715 patent is

1    it changes information where data is missing based upon the

2    information that's around it and available to somebody who

3    wants to fill in that data.  You could do this by hand.  But

4    that's what this -- this technology, that's what this

5    invention is about.

6              And FedEx does not change information where data

7    is missing.  We don't need to.  There's no point to it.

8              You heard Ms. Wagner on this point:  Ms. Wagner in

9    what we just saw in this video, PTX-122, is there any

10   description at all of having data in a database that you

11   modify based on other data in the database based on RFID

12   reads?

13             Answer:  No.

14             Changing data in any way based on other data in

15   the database?

16             Answer:  No.

17             Is that of interest of FedEx Freight?

18             Answer:  No.

19             So what you saw was an attempt to misdirect your

20   attention away from what this patent actually talks about,

21   which we're not doing, i.e., filling in missing data from

22   reads, to turn it into a RFID patent, so that now if you can

23   find that we've got an RFID scanner in one of our properties

24   somewhere or one of our factories or areas, you can claim

25   that we're infringing the patents.  You can only do that if

1   this technology in the '715 patent was 25 years older than

2   it actually is to start talking about RFID.

3           GENCO's RxLog system does not infringe Claims 1 or

4   4 of the '715 patent, as Dr. Rhyne explained.  '715 didn't

5   invent RFID, and there's no modifying of information for

6   missed RFID reads because RFID is used by FedEx only for

7   sortation and not for tracking.

8           Now, I started off and I'm coming full circle with

9   where we talked about promises made and promises kept and

10  the things that I mentioned we would be investigating

11  together during the course of this trial.

12          And one of the things that we talked about here

13  goes back to the judge, Judge Fogel, and the patent video

14  and this Honorable Court's instructions here with Judge

15  Gilstrap on patents, and the prosecution process.

16          We remind you that that process takes place in

17  private and, therefore, there are a lot of times, and this

18  is one of them, where we weren't in the room, and it would

19  have been different, we submit, had we been there.

20          The fact of the matter, ladies and gentlemen, is,

21  as I promised in the opening and I return to say that I kept

22  my promise here, we have not tried to claim that the Patent

23  Office made a mistake or missed something here.  We told you

24  where they didn't have information available to them, and we

25  tried to make sure that you had that information available

1    to you.

2          Sometimes patents are not granted but should be,

3    and sometimes patents are granted and should not be.

4          We need you, the jury, to assist us in making sure

5    that we get fair results in this process down the line, and

6    we've appreciated the attention you've shown us on this

7    particular series of patents and our defenses.

8          THE COURT:  Five minutes remaining.

9          MR. IVEY:  Thank you, Your Honor.

10         Now, against FedEx's record of achievement, you

11   saw the IV witnesses.  And the important things here are to

12   talk about what they didn't do.  There was no inspection of

13   FedEx facilities.  They ignore the explicit limitations and

14   the scope of each of the patents.  Remember, we talked about

15   trying to pick up the stakes from the property boundaries

16   and move them to other lines well beyond where they actually

17   deserve to be.

18         They greatly exaggerated the contributions of each

19   of the patents and of the four patents the inventors

20   admitted here, and we've shown you otherwise that they never

21   built or operated their inventions.

22         And you also saw something staggering which was

23   when the damages witness talked for IV, he admitted to this:

24   So your damages opinions in this case are based, at least in

25   part, on features that the inventors did not invent?

1          Answer:  That's true.

2          Ladies and gentlemen, that's what we call

3     speculation.  And that's not -- that's not what's supposed

4     to happen during the course of a trial.

5          We also heard counsel in the opening statement

6     talk about how important this case is to IV.  I think we've

7     demonstrated it's very important to FedEx.

8          What you heard said by IV in the opening was that

9     this case is very important to her, meaning Mrs. Melissa

10    Finocchio who works at Intellectual Ventures, and he said

11    here:  She's going to be here throughout the trial.

12         I told you that Mr. Grus was also going to be

13    here, along with a number of witnesses from FedEx who

14    actually took the stand and testified in front of you about

15    what they've done and why they believe this company should

16    not be penalized for its innovation and its technologies

17    simply because there are some patents people are trying to

18    stretch to cover things that we've been doing for a number

19    of years.

20         Now, in conclusion, IV claims it enhances

21    innovation by buying patents.  We submit that's not true in

22    this case.

23         Our investigation in this case together has showed

24    that IV has failed to tell you the whole story.  They

25    distorted the scope and the actual disclosure of their

1    patents.  FedEx's systems and devices came years before IV.

2    And none of our work infringes any of those patents, and

3    none of these patents should deem to be valid based upon the

4    prior art tech -- technology we've shown you both in terms

5    of publications and prior use at FedEx.

6            Now, in a moment you'll have this case and I will

7    have to sit down, and we'll -- we'll commend it to you.  And

8    you'll be given a verdict form where we talk about the fact

9    that all of these patents, '581, '586, '356, and '715 are

10   not infringed and they are invalid.

11           You'll have a verdict form which has Question 1:

12   Did the Plaintiff prove by a preponderance of the evidence

13   that we have in any way infringed any of these patents?

14           And we respectfully urge you to mark for each of

15   these patents no.

16           The next thing you'll have to do is look at the

17   second question, which has to do with willful infringement.

18   We submit that since there is no infringement in the first

19   place, it certainly isn't willful.  We have never taken

20   anything from anyone that we -- we needed.  If we've ever

21   needed anything, we bought it, we were upfront about that,

22   and we brought it into our systems.  And a lot of it didn't

23   exist, and so we made it ourselves.  We have never taken

24   anything from anyone.  We never needed anything, and we

25   still don't need anything from the IV patents that you've

1    been shown in this case.  They have nothing to do with our

2    overnight freight and delivery capabilities.

3           The final question you'll be asked here is whether

4    the Defendants, that's FedEx, has proved by clear and

5    convincing evidence that these patents are invalid.

6           We submit ladies and gentlemen, that our evidence

7    has been clear, it is convincing when you look at references

8    like ANSI, like interNetShip, and like Multicode, there's no

9    question that there's no daylight, there's no distance

10   between what's in those references in our prior use and

11   what's in the patents, for example, like '586.

12          And I want to now say that this is my final

13   opportunity to speak with you.  And it has been an honor to

14   represent FedEx in this case and to talk to you as jurors in

15   this case about what we do, how we do it, how long we've

16   been doing it, and how proud we are of what we do.  And I

17   want to join with the FedEx representatives, and this

18   Honorable Court in thanking you for your service and

19   thanking you for your attention.

20          Your Honor, thank you.

21          THE COURT:  All right.  Mr. Kellman, you may now

22   present the Plaintiff's final closing argument.  You have 11

23   minutes and 15 seconds left.  Would you like a warning?

24          MR. KELLMAN:  Three-minute warning, please.  And

25   may I have a minute to set up?

1            THE COURT:  Yes, you may have a minute.

2            (Pause in proceedings.)

3            THE COURT:  All right.  Counsel, you may proceed.

4            MR. KELLMAN:  Thank you, Your Honor.

5            Ladies and gentlemen, let me just correct the

6    record for a moment regarding the patents-in-suit and the

7    time frames.

8            Mr. Ivey spent time during his opening and

9    throughout this case putting up the issue date of the

10   patents, the date that the Patent Office eventually granted

11   it.

12           As you heard in the patent video in the very

13   beginning, sometimes it takes a long time to go through the

14   Patent Office because those patents are being examined by

15   expert examiners.  So some of them didn't issue until 2013.

16           But the key date when we're trying to figure out

17   when the innovation took place are these dates:  2000 for

18   Mr. Barbosa, 2001 for Mr. Baych, 2000 and 2005 for the

19   patents that do talk about RFID technology and how to use

20   RFID technology.  That is way before FedEx began using that

21   actual technology, and those are the dates that matter.

22           Thank you.

23           So I heard -- when I began talking to you, I

24   walked through all of the problems that FedEx had with its

25   case.  Mr. Ivey didn't address any of those in his opening.

1   He went through -- in his closing, he went through what he

2   had prepared.  He walked through it.  Every single one of

3   the experts that FedEx put up relied on something other than

4   the Court's claim construction and something other than the

5   rules that are required for patent cases.

6           Mr. Williams over and over again did not use the

7   Court's claim construction.  In fact, you remember this.  He

8   took Dr. Sharony to task for getting Figure 13 wrong.  We

9   had to go through that function and structure.  And he said:

10  Oh, he's not using -- here I think it was 1303 -- and then

11  when I asked him the question on the stand, he said:  Oh,

12  yeah, sorry, my fault, the Court doesn't actually require

13  that.  So he criticized Dr. Sharony for following the

14  Court's claim construction.  That's backwards.  That's not

15  the way this works.

16          Mr. Ackley.  Mr. Ackley, who Mr. Ivey just relied

17  on.  You know, you have to believe Mr. Ackley if you believe

18  these patents are not infringed and invalid.  He admitted

19  and Mr. Ivey didn't address this -- he admitted that he

20  never look -- he never went through the patents and compared

21  the Court's constructions to the claims.  All Mr. Ivey said

22  was:  Oh, yeah, before he came in, he looked at the claim

23  construction.

24          How is he going to convince you that he did it

25  right if he doesn't take you through it?  We spent a lot of

1    time with Dr. Engels and Dr. Sharony walking through each

2    claim element, and it took awhile, and I'm sorry about that,

3    but that's our job.  And that's why we did it.

4              Mr. Ackley never took that seriously.

5              And then Dr. Rhyne.  Dr. Rhyne, again, he's the

6    one who they need you to believe to avoid willfulness.

7              By the way, one thing we heard.  We didn't hear

8    Mr. Ivey talk about invalidity at all for the RFID patents.

9    That's because Dr. Rhyne wasted your time walking through

10   and saying that all of the claim elements were met by the

11   prior art.  You remember this yesterday.  And then I walked

12   through with him one-by-one and said:  Well, actually you

13   don't think they really are met if you apply the Court's

14   claim construction.

15             And he said yes to all of them.

16             And remember the last thing Dr. Rhyne said, and

17   this goes to the willfulness case.  I asked him, I said:

18   Despite the fact that nothing in the prior art, nothing at

19   all, is actually -- actually shows the claim elements -- I

20   said -- you still want to take Angela Woody's patent away?

21             And he said:  Yes.

22             Come on.  That is not appropriate behavior.  That

23   is willfulness.  And they're relying on Dr. Rhyne for

24   willful infringement.

25             Let me show you.  Here, the facts that Dr. Rhyne

1   relies on come from Melissa Wagner.

2          Now, remember, Melissa Wagner told you she used to

3   work on the RFID project for Freight 2020, but she no longer

4   does.  By November of last year, she stopped working on it,

5   and that's the witness that they brought in to tell you

6   about what's going on.

7          I asked -- we learned that the RF -- FedEx learned

8   about the RFID patents August 31st, 2016, and September

9   2016, they put a $400 million investment into doing that.

10  That is deliberate infringement.

11         I asked Ms. Wagner, I said:  When the FedEx board

12  of directors met with respect to this presentation, did

13  patents come up at all?

14         No, they didn't come up in the discussion.

15         That is sticking your head in the sand.  That is

16  deliberate indifference.  They're not paying attention to

17  what they knew just a month before.

18         I asked her:  Now, you also in developing -- in

19  developing projects such as Freight 2020 RFID, you don't

20  take into account whether the technology you're developing

21  is infringing?

22         Answer:  Right.

23         They don't think about it.

24         I asked again:  FedEx Freight made no changes to

25  its software in response to learning about the patent and

1    this litigation?

2              That's correct.

3              They don't even try to avoid infringing.

4              Then I asked again:  There was a plan, though --

5    so here's the one thing that they did change -- there was a

6    plan made in response to this litigation not to roll out in

7    Texas?

8              Does that make any sense?  So they're not changing

9    the product, but while this trial is going on, they're going

10   to hold back and not go into Texas, even though their entire

11   plan is to go and roll out to everyone else.  That, folks,

12   is willful infringement.

13             Ms. Wagner confirmed that the Freight 2020 plane

14   only has fuel on board for a one-way trip.  They're not

15   stopping this even if they're holding it back from Texas for

16   a moment.  The infringement is ongoing now that they're

17   testing.  Testing doesn't get you out of infringement.

18             They're doing it.  They told you.  Ms. Wagner told

19   you that.  They're actually doing it now.  And then as soon

20   as this trial is over, they're going to continue to do just

21   like she told you.  You have to hold them responsible for

22   that.

23             Now, we didn't hear very much at all from Mr. Ivey

24   about damages.  But we did a little bit.  He criticized

25   Mr. Wagner just briefly and said that some of his analysis

1   was not based on the patented technology.  I'm going to take

2   you through that in one minute.  But let's hear what we

3   didn't hear at all.

4            We didn't hear about Dr. Stiroh and her analysis.

5   Why?  Because it's wrong.  It's not legally correct.  And

6   she admitted it on the stand.  Her entire analysis is wrong.

7            This is her slide.  This is the very first thing

8   she told you yesterday when she got on the stand, that the

9   damages statute requires a reasonable royalty, okay?  She

10  highlighted that.  She never gave you a reasonable royalty.

11  She gave you a -- what she called a minimum royalty,

12  whatever that actually is.  And then it's for the use made

13  of the invention by the infringer.  Never once on the stand

14  did Dr. Stiroh talk about the use that FedEx made.  And, of

15  course, she can't because the use is enormous by FedEx.  And

16  that's what generates the numbers that Mr. Wagner made.

17           If you have someone who's using it a little, they

18  pay a small royalty.  If you have someone who's using it a

19  lot, they pay a larger royalty.  That's the way property

20  works.  It's simple.  And it's written right into the

21  statute that's passed by Congress.  That's what it says, and

22  she didn't do it.

23           THE COURT:  Three minutes remaining.

24           MR. KELLMAN:  Thank you, Your Honor.

25           Let's talk about what Mr. Wagner did.  What

1    Mr. Wagner did was he talked about the hypothetical

2    negotiation.  And the hypothetical negotiation was what two

3    parties getting together -- it's what you're required to do,

4    two parties getting together, and talking about what they

5    would come up with.

6            Dr. Stiroh didn't talk about that at all.  And

7    when they would have talked to each other, they would have

8    said:  FedEx, how much are you planning to use this?  What's

9    going on?  And that would have been part of the discussion.

10            So what did Mr. Wagner do?  He started with what

11    are the revenues and money earned as a result of the

12    products that infringe, and that's how he came up with his

13    numbers.

14            For the '586, this is the sending electronic and

15    creating the labels.  And FedEx made $13.7 billion over the

16    course of these patents' infringement, 13.7 billion in

17    profit alone, okay?  Does all of that profit come from the

18    actual patent?  No.  That's what Mr. Wagner was saying.

19            So Mr. Wagner lowered it.  He lowered it to figure

20    out what was actually attributable to the patents.

21    Remember, we saw 1/150 of the technology.  That was put up

22    by Mr. Wagner and Dr. Engels, and it kept getting lower and

23    lower and lower.  In fact, this scale -- I can't even put it

24    on the board how high.  This is 13 billion.  It would be up

25    in the ceiling.  And he came to a total number of 37 million

1   from 13 billion in profit.

2           Same thing with the '581, $190 million in profit,

3   only a $48 million royalty.

4           $98 million in profit for the '715, only 8.7

5   million.

6           And likewise, for the '356.

7           Mr. Wagner did, when he started, take into account

8   portions that weren't infringing, but then he lowered it in

9   order to get to just the infringing part.  No one has

10  disputed it.  You have to make a decision based on the

11  evidence.  No one's disputed that.

12          Finally, ladies and gentlemen, you saw the verdict

13  form that Mr. Ivey put up.  We respectfully disagree with

14  him on the results.

15          On the first page, you'll be asked do they

16  infringe?  Does FedEx infringe?  The answer to all of those

17  based on the witnesses that we heard is yes.

18          The next question is:  Is there willful

19  infringement, and -- and we're only asking for willful

20  infringement for when they knew it and they deliberately did

21  it on the '715 and '356.  And the answer to those two

22  questions is yes.

23          Finally, there's a whole list of questions about

24  invalidity.  And, again, you have to believe their experts

25  in order to get here.  Their experts didn't do it, their

1  fact witnesses said otherwise -- otherwise, the answer is

2  no.

3          And then finally, the question of damages, the one

4  slide Mr. Ivey did not show you from the verdict form, it

5  asks for a number.  That's the number, ladies and gentlemen.

6  No one challenged it, not once in this entire case.

7  Mr. Wagner's calculations are a hundred percent right.  And

8  no one has challenged it.

9          THE COURT:  Time is expired, counsel, take a

10 second and finish up.

11         MR. KELLMAN:  Okay.  You can make FedEx finally

12 take responsibility, you can make -- you can send a message

13 to FedEx that doing this is not right.  That they have to

14 follow the rules.  That's your job as jurors.

15         Thank you very much for all of your time and

16 attention, and we look forward to your verdict.

17         Thank you.

18         THE COURT:  All right.  Let's pull these down and

19 each take your places at counsel tables.

20         Ladies and gentlemen of the jury, I have a few

21 final instructions I'd like to give you before you begin

22 your deliberations in this case.

23         You must perform your duty as jurors without bias

24 or prejudice as to any party.  The law does not permit you

25 to be controlled by sympathy, prejudice, or public opinion.

1          All the parties expect that you will carefully and

2    impartially consider all the evidence, follow the law as I

3    have given it to you, and reach a just verdict, regardless

4    of the consequences.

5          Answer each question in the verdict form from the

6    facts as you find them to be, following the instructions

7    that the Court has given you.  Do not decide who you think

8    should win this case and then answer the questions in the

9    verdict accordingly.  I remind you, your answers and your

10   verdict in this case must be unanimous.

11         You should consider and decide this case as a

12   dispute between persons of equal standing in the community,

13   of equal worth, and holding the same or similar stations and

14   situations in life.  This is true in patent cases between

15   corporations, partnerships, or individuals.  A patent owner

16   is entitled to protect its patent rights under the United

17   States Constitution, including bringing a suit in a United

18   States District Court such as this for money damages for

19   infringement.

20         The law recognizes no distinction between types of

21   parties.  All corporations, partnerships, other

22   organizations stand equal before the law, regardless of

23   their size or who owns them, and they are to be treated as

24   equals.

25         Now, when you retire to the jury room to

1    deliberate on your verdict, you're each going to have a

2    copy -- a separate written copy of these final jury

3    instructions to take with you.  If during your deliberations

4    you should desire to review any of the exhibits that the

5    Court has admitted into evidence during the trial, you

6    should advise me of that by a written note signed by your

7    foreperson and delivered to the Court Security Officer, and

8    I will then send that exhibit or those -- those exhibits to

9    you.

10          Once you retire, you should first select your

11   foreperson, and then conduct your deliberations.  If you

12   choose to recess during your deliberations, follow all the

13   instructions that the Court has given you about your conduct

14   during the trial.

15          After you've reached your verdict, your foreperson

16   is to fill in the verdict form in a way that reflects your

17   unanimous answers to those questions.  You should not reveal

18   your answers until such time as you're discharged by me or

19   otherwise directed, and you must never disclose to anyone,

20   not even to me, your numerical division on any question.

21          Any notes you've taken during the course of the

22   trial are aids to your memory only.  If your memory should

23   differ from your notes, rely on your memory and not your

24   notes.

25          The notes are not evidence.  A juror who has not

1    taken notes should rely on his or her own independent

2    recollection of the evidence and should not be unduly

3    influenced by the notes of other jurors.  Notes are not

4    entitled to any greater weight than the recollection or

5    impression of each juror about the testimony.

6              If you want to communicate with me at any time

7    during your deliberations, you should give a written message

8    or question signed by your foreperson to the Court Security

9    Officer who will bring it to me.  I'll then respond to you

10   as promptly as possible, either in writing or by having you

11   brought back into the courtroom where I can address you

12   orally.  I will always first disclose to the attorneys in

13   the case your question and my response before I answer any

14   question.

15             After you have reached your verdict and I have

16   discharged you from your responsibility as jurors in the

17   case, you're not required to talk with anyone about your

18   service in this case.

19             By the same token, after that has happened, if you

20   choose to discuss your service in this case, you will be

21   perfectly free to.  That decision is yours, ladies and

22   gentlemen, and yours alone at that time.

23             I'll now hand eight copies of these final jury

24   instructions and one clean copy of the verdict form to the

25   Court Security Officer to deliver to you in the jury room.

1              Ladies and gentlemen of the jury, you may now

2       retire to the jury room to deliberate.  We await your

3       verdict.

4              COURT SECURITY OFFICER:  All rise.

5              (Jury out.)

6              THE COURT:  Counsel, you are welcome to wait here

7       in the courtroom.  If you choose to wait off the premises,

8       be sure that my staff has good working cell phone numbers

9       where you can be reached in the event we need to call you

10      back.  That, I leave to your discretion.  We'd be happy to

11      have you here or elsewhere, your decision.

12             Pending a question from the jury or a return of

13      their verdict, we stand in recess.

14             COURT SECURITY OFFICER:  All rise.

15             (Recess.)

16             ***********************************************

1

2

3

4                           CERTIFICATION

5

6              I HEREBY CERTIFY that the foregoing is a

7  true and correct transcript from the stenographic notes of

8  the proceedings in the above-entitled matter to the best of

9  my ability.

10

11

12  /s/Shelly Holmes                              _5/18/18
    SHELLY HOLMES, CSR, TCRR                        Date
13  OFFICIAL COURT REPORTER
    State of Texas No.: 7804
14  Expiration Date: 12/31/18

15

16

17

18

19

20

21

22

23

24

25