**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| INTELLECTUAL VENTURES II LLC, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | **CIVIL ACTION NO. 2:16-CV-00980-JRG** |
| | § | |
| FEDEX CORPORATION, FEDERAL | § | |
| EXPRESS CORPORATION, FEDEX | § | |
| GROUND PACKAGE SYSTEM, INC., | § | |
| FEDEX FREIGHT, INC., FEDEX CUSTOM | § | |
| CRITICAL, INC., FEDEX OFFICE AND | § | |
| PRINT SERVICES, INC., GENCO | § | |
| DISTRIBUTION SYSTEM, INC., | § | |
| | § | |
| *Defendants.* | § | |

**MEMORANDUM OPINION AND ORDER**

Before the Court is Plaintiff Intellectual Ventures II LLC's ("IV" or "Plaintiff") Motion for Judgment as a Matter of Law Under Rule 50(b) (Dkt. No. 561) ("the Motion"). Having considered the Motion, and for the reasons set forth below, the Court finds that the Motion should be and hereby is **DENIED**.

## I. BACKGROUND

On August 31, 2016, IV filed suit against Defendants FedEx Corporation, Federal Express Corporation, FedEx Ground Package System, Inc., FedEx Freight, Inc., FedEx Custom Critical, Inc., FedEx Office and Print Services, Inc., and GENCO Distribution System, Inc. (collectively, "FedEx" or "Defendants"), alleging infringement of United States Patent Nos. 6,909,356 ("the '356 Patent"), 7,199,715 ("the '715 Patent"), 8,494,581 ("the '581 Patent"), and 9,047,586 ("the '586 Patent") (collectively, the "Patents-in-Suit" or "Asserted Patents"). (Dkt. No. 1 ¶¶ 1–13.)

The Court held a jury trial between May 14, 2018 and May 18, 2018, whereupon the jury returned a verdict finding each Asserted Claim of each Asserted Patent to be not infringed, that each Asserted Claim of the '581, '586, and '356 Patents were invalid, and that each Asserted Claim of the '715 Patent was not invalid. Following the verdict, the Court entered Final Judgment on May 21, 2018 in accordance with the verdict.

## II.     LEGAL STANDARD

### A.  Renewed Motion for Judgment as a Matter of Law

"A motion for judgment as a matter of law [under Rule 50(b)] is a challenge to the legal sufficiency of the evidence supporting the jury's verdict." *Erfindergemeinschaft UroPep GbR v. Eli Lilly & Co.*, 276 F. Supp. 3d 629, 643 (E.D. Tex. 2017) ("*UroPep*") (Bryson, J., sitting by designation). Entry of judgment as a matter of law is therefore only appropriate when "there is no legally sufficient evidentiary basis for a reasonable jury to find as the jury did." *Guile v. United States*, 422 F.3d 221, 225 (5th Cir. 2005); *see also Baisden v. I'm Ready Prods., Inc.*, 693 F.3d 491, 498 (5th Cir. 2012) ("A district court *must* deny a motion for judgment as a matter of law unless the facts and inferences point so strongly and overwhelmingly in the movant's favor that reasonable jurors could not reach a contrary conclusion.") (emphasis added) (internal quotation marks omitted).[1]

"In evaluating a motion for judgment as a matter of law, a court must 'draw all reasonable inferences in the light most favorable to the verdict.'" *Metaswitch Networks Ltd. v. Genband US LLC*, No. 2:14-CV-00744-JRG, 2017 WL 3704760, at *2 (E.D. Tex. Aug. 28, 2017) (quoting *E.E.O.C. v. Boh Bros. Const. Co., L.L.C.*, 731 F.3d 444, 451 (5th Cir. 2013)). Courts must also

---

[1] *See also Finisar Corp. v. DirecTV Group, Inc.*, 523 F.3d 1323, 1332 (Fed. Cir. 2008) ("The grant or denial of a motion for judgment as a matter of law is a procedural issue not unique to patent law, reviewed under the law of the regional circuit in which the appeal from the district court would usually lie.").

avoid the temptation of revisiting credibility determinations or reweighing evidence. *Id.* Such determinations are, appropriately, left to the jury. *Montano v. Orange Cty., Texas*, 842 F.3d 865, 874 (5th Cir. 2016) ("[I]t is for the jury alone to judge the credibility of witnesses and weigh the evidence.").

### B. **Infringement**

To prove infringement under 35 U.S.C. § 271, a plaintiff must show the presence of every element, or its equivalent, in the accused product or service. *Lemelson v. United States*, 752 F.2d 1538, 1551 (Fed. Cir. 1985). First, the claim must be construed to determine its scope and meaning; and second, the construed claim must be compared to the accused device or service. *Absolute Software, Inc. v. Stealth Signal, Inc.*, 659 F.3d 1121, 1129 (Fed. Cir. 2011) (citing *Carroll Touch, Inc. v. Electro Mech. Sys., Inc.*, 15 F.3d 1573, 1576 (Fed. Cir. 1993)). "A determination of infringement is a question of fact that is reviewed for substantial evidence when tried to a jury." *ACCO Brands, Inc. v. ABA Locks Mfr. Co.*, 501 F.3d 1307, 1311 (Fed. Cir. 2007).

### C. **Obviousness**

"Obviousness" is a matter of law based on underlying factual findings, and is grounds for unpatentability when the claimed subject matter is not identically described, if the subject matter as a whole would have been obvious to a person having ordinary skill in the field of the invention. 35 U.S.C. § 103(a); *see also KSR Int'l, Inc. v. Teleflex, Inc.*, 550 U.S. 398, 406-07 (2007). When obviousness is based on information from a combination of sources, the question is whether a person of ordinary skill in the field would have been motivated to select and combine this information, and with a reasonable expectation of achieving the desired result. *See, e.g.*, *Merck & Cie v. Gnosis S.p.A.*, 808 F.3d 829, 833 (Fed. Cir. 2015).

# III.    DISCUSSION

## A.  Infringement of the '581 Patent

Claims 18 and 20 of the '581 Patent provide:

18. An apparatus, comprising:

> [a] means for establishing a two-way communication channel between a server and at least one handheld device located at a field geographically distant from the server;
>
> [b] means for accessing a program stored at the server to enable an assessment at the field using the at least one handheld device;
>
> [c] means for managing data collected at the field using the at least one handheld device responsive to program;
>
> [d] means for determining a geographic location of the at least one handheld device; and
>
> [e] means for enabling communicating the data collected at the field and the geographic location of the at least one handheld device between the at least one handheld device and other devices or the server.

. . .

20. The apparatus of claim 18, further comprising means for enabling updating field operation assignments for each of the at least one handheld device.

'581 Patent at 14:55–15:2, 15:5–7.

IV argues that it both presenting "abundant evidence that the PowerPad and Star IV handheld devices made and operated by and for Corp., Express, and Ground meet every limitation of apparatus claims 18 and 20 of the '581 patent" and that "none of the testimony [Defendants' witnesses] provided in rebuttal overcame [Plaintiff's expert's] infringement showing." (Dkt. No. 561 at 12, 17.)

The Parties do not dispute that the Accused Products perform claim elements [a], [c], [d], or the elements added by dependent Claim 20. (*See* FedEx's Responsive Briefing, Dkt. No. 572 at 4–11.) Accordingly, the Court confines its analysis to Claim Elements [b] and [e].

4

### 1. Claim Element [b]: "Means for Accessing . . ."

The Court construed "means for accessing a program stored at the server to enable an assessment at the field using the at least one handheld device" to be a means-plus-function claim wherein the function is "accessing a program that is stored at the server to enable an assessment at the field using the at least one handheld device, wherein accessing a program requires more than accessing a database storing data" and the corresponding structure is "a processor, along with a user interface, RAM, ROM, configured to make a service request to a server program, and a server program configured to fulfill the request." (Claim Construction Order, Dkt. No. 165 at 83–86.)

IV argues that Dr. Sharony properly "identified the Court's claim construction and explained how both the Star IV and the PowerPad met the function of that limitation as construed by the Court." (Dkt. No. 561 at 14 (citing May 14, 2018 Afternoon Session, Dkt. No. 541 at 155:21–156:23).) IV notes that Dr. Sharony explained how the devices access a program at the server using his expertise and certain FedEx documents. (*Id.*; *see also* PTX-0213, PTX-0220, PTX-0499.)

FedEx responds that it "introduced substantial evidence that the PowerPad and Star IV do not access a program at a geographically distant server," because such devices not only "do not access a remote program," but were designed not to do so. (Dkt. No. 572 at 5 (citing May 16, 2018 Morning Session, Dkt. No. 546 at 110:16–116:11).) Specifically, FedEx asserts that its experts opined that the DWS and ROADS systems pushed data to other intermediary systems on their own accord, rather than the PowerPad and Star IV devices accessing DWS and ROADS directly. (*Id.* at 5–6.)

IV replies that Dr. Sharony testified, and PTX-499 shows, that "PowerPad accesses DWS—which the parties agree is a 'program'—for sign-on." (Dkt. No. 577 at 2.) DWS then "sends a 'response,' allowing the PowerPad to 'get in return manifests and updates,'" and made

similar assertions with regards to the Star IV device. (*Id.* (citing May 14, 2018 Afternoon Session, Dkt. No. 541 at 155:21–157:18).) IV further argues that a reasonable jury could not have credited Mr. Williams' testimony regarding the intermediary servers because "[t]hose assertions contradicted [Defense's expert] Mr. Smith's testimony that explained that those 'intermediary servers' were actually just 'pipes,' or 'plumbing to move data around,' and that 'on the road,' DWS may 'transmit updates' to the PowerPad." (*Id.* at 3 (citing May 16, 2018 Morning Session, Dkt. No. 546 at 80:2–19, 83:11–14).)

FedEx sur-replies that PTX-213 and PTX-499 are irrelevant because they merely show a "sign-on" request, and not access that obtains the manifest. (Dkt. No. 580 at 2.)

While Dr. Sharony testified that both the Star IV and the PowerPad met the "accessing" limitation, he did so through conclusory statements about PTX-213 and PTX-499, respectively. For example, with regards to Claim 1, Dr. Sharony used PTX-213 to illustrate that the Star IV accessed the P&D login service, the pickup listing web service, and the delivery manifest web service. (May 14, 2018 Afternoon Session, Dkt. No. 541 at 131:15–25; *see also* Dkt. No. 541 at 132:3–10 ("So at the start of the day, the handheld device, through the P&D login web service, has to log into the system to – in order to get the pickup listing and the delivery manifest. So once successfully logged in, these two program [sic] will provide the handheld device with the listing -- or the delivery listing, which we call the manifest -- delivery manifest, and the pickup listing or the pickup manifest.").) Dr. Sharony repeated his belief that accessing the P&D login, pickup listing, and delivery manifest performed the "accessing a program" claim element of Claim 18. (*Id.* at 155:20–25.) Similarly, Dr. Sharony testified that the PowerPad performed the claim element by accessing the DWS assessment program. (*Id.* at 157:12–17 ("Q. Does the FedEx Express system

perform accessing a program? A. Yes, it does. Q. Okay, And how so? A. By sending this request from the handheld to the DWS successful login, we get in return manifest and updates.").)

As to the Star IV, Mr. Williams testified that the extracted pickup and delivery manifests are not themselves programs, as the Court construed the term, because such manifests are "data files" and the Court's construction requires more than accessing a database holding data. (*Id.* at 114:14–115:6.) IV does not address this argument in its briefing and only appears to address PowerPad's DWS system on cross-examination. (*See generally* May 16, 2018 Afternoon Session, Dkt. No. 547 at 13:24–22:25.) Further, while IV asserts that Mr. Williams and Mr. Smith admitted that DWS is a "program," such admissions were made in the context of DWS being a "software program," and not a "program" as construed by the Court. (*See id.* at 13:24–14:22.)

The Court finds that a reasonable jury could have determined that the Star IV device did not perform the "accessing" claim element of Claim 18. Plaintiff's briefing does not contest that the accessed manifests are data, nor that the "programs" performing the accessing are doing more than merely accessing a database. Further, while Plaintiff asserts that "Mr. Williams did not opine on noninfringement for the 'P&D Login web service,'" it has not identified any program stored on the login server that enables an assessment to take place.

As to the PowerPad, Mr. Williams took a slightly different tack and testified that the manifests, listings, and updates were not accessed by the handheld device, but instead were pushed to the device from intermediate servers. For example, with regards to the PowerPad, Mr. Williams testified:

> Q. In your opinion, at this start of day, does the PowerPad access a program stored on the DWS servers?
>
> A. It does not.
>
> Q. Can you explain to us what's shown in green at the bottom of DTX-408?

A. Green is about communications that can take place once the courier and the PowerPad device have -- have left the station are -- and are out in the field and if communications is necessary at that point.

The courier -- the bottom part of the green part is courier outbound, which you heard described as being when there's a -- an update to a pickup manifest that needs to take place, and that is pushed out to JMSQ, which is the cylindrical object. And then that, in turn, is pushed out to the network gateway server and ultimately to the courier device.

. . .

Q. In your opinion, sir, does the PowerPad access ROADS to receive delivery manifest?

A. No, it does not.

Q. And why not?

A. Again, because of the purposeful separation or intentionally separate design that underlines much of FedEx's system design philosophy. So here, the steps involve ROADS publishing or pushing out, if you will, the delivery manifest to the JMSQ. Then the StarBase server will then do what's called consume the manifest, which is going -- when it is on its own schedule, goes and extracts that delivery manifest, and then it will route the manifest to the appropriate StarBase client, one of potentially thousands, and then it will send the -- for -- for the particular client, it will send the -- push out to the individual PowerPads, the -- the manifest for that station.

(May 16, 2018 Morning Session, Dkt. No. 546 at 112:11–113:1.; 113:9–24).

Accordingly, as to the PowerPad, the Court finds that a reasonable Jury could have determined that the relevant data was pushed from the servers to the handheld devices, rather than the handheld devices access programs to extract the relevant data from the DWS and ROADS servers. This difference in directionality is sufficient for a reasonable jury to conclude that the handheld device did not access the program, as required by claim element [b]. The Court further notes that Plaintiff's cited documents, PTX-213 and PTX-499, merely show bidirectional lines going from the handheld devices to other computers to the login services, and then to whichever

services or databases hold the relevant information. Such documents are insufficient to sway a reasonable jury one way or the other in this battle of the experts.

Accordingly, having found that a reasonable jury could have found that neither accused device performs the limitations of claim element [b], the Court finds that such a jury could have properly determined that FedEx did not infringe independent Claim 18 or dependent Claim 20 of the '581 Patent.

### 2. Claim Element [e]: "Means for Enabling Communicating"

The Court construed "means for enabling communicating the data collected at the field and the geographic location of the at least one handheld device between the at least one handheld device and other devices or the server" as a means-plus-function term subject to 35 U.S.C. § 112(6), wherein the function is "enabling communicating the data collected at the field and the geographic location of the at least one handheld device between the at least one handheld device and other devices or the server" and the corresponding function is "a processor configured to implement the algorithm as represented in Figure 13 and accompanying references in the specification, in conjunction with Global Positioning System (GPS) hardware and software, and/or signal triangulation hardware and software and wireless modem, cellular wireless transmitters, along with a processor, RAM, ROM." (Claim Construction Order, Dkt. No. 165 at 90–94.)

As with Claim Element [b], IV asserts that "Dr. Sharony identified the Court's claim construction, and then explained how in his opinion, (and relying on earlier-discussed evidence) each of the Star IV and PowerPad devices performed that function, using the claimed structure[, including the algorithm found in Figure 13]." (Dkt. No. 561 at 15 (citing May 14, 2018 Afternoon Session, Dkt. No. 541 at 166:10–170:7).) IV further asserts that FedEx's questioning of Dr. Sharony was directed to irrelevant bases, such as whether Dr. Sharony performed "a proper and complete analysis of the Figure 13 algorithm required for the fifth limitation of claim 18," rather

than just those elements that were "pertinent to the Court's construction of the limitation." (*Id.* (citing May 15, 2018 Morning Session, Dkt. No. 542 at 17:10–27:10).)

FedEx responds that the Court's construction required "implement[ing] the algorithm as represented in Figure 13," and that as Dr. Sharony only addressed step 1304, the jury could reasonably have found that Plaintiff failed in its burden of proof. (Dkt. No. 572 at 8–9.) FedEx further argues that Mr. Williams testified that FedEx "do[es] not perform step 1303 of Figure 13," and that as there is a material factual dispute between the Parties, the jury is entitled to weigh the evidence and decide as to which Party it agrees. (*Id.* at 9.)

IV replies that the "Court's construction only requires step 1304, because that is the only step associated with the function; thus, Dr. Sharony was applying the Court's construction, not redoing it." (Dkt. No. 577 at 3 (citing Dkt. No. 165 at 90).) IV further notes that Mr. Williams was admonished by the Court for asserting that step 1303 was relevant, and that Mr. Williams later admitted that step 1303 was irrelevant. (*Id.* at 10–11 (citing May 16, 2018 Afternoon Session, Dkt. No. 547 at 23:2–33:21).)

FedEx sur-replies that "IV never sought a construction limited to step 1304, and it is too late for IV to make this argument on JMOL," that "the Court's construction requires 'the algorithm as represented in Figure 13,' not just one step of it," and that Mr. Williams testified as to all four steps in Figure 13 as to how FedEx did not meet the claim language. (Dkt. No. 580 at 3.)

The Court's construction explicitly requires that the processor is "configured to implement *the algorithm* as represented in Figure 13." (Claim Construction Order, Dkt. No. 165 at 93 (emphasis added).) No part of the Court's construction limits the applicable part of the algorithm to step 1304. Further, while the Court did admonish Mr. Williams, such admonishment was for

explaining the analysis of the Claim Construction Order, not for opining that step 1303 was required:

Q. So in your opinion, sir, Dr. Sharony was required to do Step 1303, correct?

A. Correct.

Q. And Step 1303, if you can read it here, says: Support provided to remote operator. Do you see that?

A. Yes.

Q. Okay, But you think 1303 needs more than that, right?

A. The -- well, 1303 says: Support provided remote operator. And the specification includes the reference procedural guidance via two-way communication, so --

Q. I'm sorry, I didn't mean to interrupt you. Were you finished?

A. So the -- I'm elaborating on the five words in the third box of 1303.

Q. So -- so in your view, the Court's claim construction requires for the means for enabling communication -- communicating that there be procedural guidance -- that procedural guidance can be provided through two-way communications with remote representatives. That's your opinion, right?

A. The Court required that the algorithm represented by Figure 13 be executed, and my opinion is that for that algorithm to be executed, all four of those steps need to be executed.

[IV's Counsel]: Your Honor, I object as nonresponsive.

The Court: I'm going to sustain that objection. . . . Did I just hear this witness start to explain the analysis in the Court's claim construction order in violation of the order as to what the algorithm must do and what it means?

The Court's very clear in its order that the only discussion of the claim construction order is the term that was called into question and the construction that was adopted.

(May 16, 2018 Afternoon Session, Dkt. No. 547 at 23:25–25:12.)

After the Court's admonishment, counsel for IV resumed questioning Mr. Williams:

Q. . . . In Claim 13, this is your slide again, Claim 13 [sic], you say Step 1303 has to be applied, correct?

A. Correct.

(*Id.* at 32:10–12.)

While Mr. Williams then concedes that "Step 13" "has nothing to do with the function that -- of this claim element," the jury is permitted to read the language of the claims and the Court's constructions, and the plain language of both is that the processor must be configured to perform the entire algorithm, even if portions of the algorithm are not used for the remainder of the claim. Similarly, despite Mr. Williams' testimony that his assertion that "Dr. Sharony left out 1303 in his analysis of the means for enabling [is] faulting Dr. Sharony for complying with the Court's construction," such testimony reinforces the idea that there is a material dispute between the two experts.

The Court finds that the jury heard the competing testimony of two experts, weighed such testimony, and ultimately agreed with Mr. Williams that the processor must be capable of performing the entire algorithm. As IV provided no evidence that such processors of the accused devices are configured to perform steps 1301–03, a reasonable jury could therefore have concluded that FedEx's Star IV and PowerPad did not infringe independent Claim 18 or dependent Claim 20 of the '581 Patent.

### 3. Claim Element [e]: "communicating . . . the geographical location . . . between the at least one handheld device and other devices or the server."

IV asserts that FedEx's theory that Claim 18 requires that GPS data be sent back to the same computing device is erroneous because the claim language states that the location data must be sent to "other devices or the server." (Dkt. No. 561 at 17–18.) IV notes that Mr. Williams never opined on whether the "other devices" could include other servers and "agreed that FedEx, at the very least, sends GPS data and collected field data to other devices in accordance with claim 18," and that Mr. Williams "agreed that FedEx . . . sends GPS data and collected field data to other devices in accordance with claim 18." (*Id.* at 18)

FedEx responds that Mr. Smith testified that neither "the twenty DWS servers [n]or forty ROADS servers . . . .receive GPS data, and that the GPS data goes back to a different server." (Dkt. No. 572 at 10 (citing May 16, 2018 Afternoon Session, Dkt. No. 547 at 66:8–70:4, 97:4–104:24, 110:4–9).) FedEx further argues that while IV has asserted that "Mr. Williams never stated that the 'other devices' . . . could not include other servers . . . . Dr. Sharony never stated that the 'other devices' could include anything other than other 'handheld devices,' which are the only 'devices' in claim 18." (Dkt. No. 572 at 10.) FedEx further notes that Dr. Sharony "never testified that the accused devices met the alternative 'other devices' language, and he never argued that GPS data goes back to anything but the same remote server that was accessed." (*Id.* (citing May 14, 2018 Afternoon Session, Dkt. No. 541 at 166:20–167:23).)

IV replies that Dr. Sharony testified that "the GPS data is communicated back to the back-end servers so that it can be used by the DWS, ROADS, and P&D programs" and that FedEx's other arguments are improper attempts to reurge claim construction. (Dkt. No. 577 at 4 (citing May 14, 2018 Afternoon Session, Dkt. No. 541 at 147:12–151:5, 165:3–170:7).)

There is no question that Dr. Sharony presented evidence that the Accused Devices sent geographic information back to FedEx. For example, when asked whether "there [was] any evidence that FedEx Ground perform[ed] Step 1304," Dr. Sharony replied that FedEx Ground "collected the stop data, collected signature, provide it to the back end. Mr. Stanley, employee of FedEx, was asked a question: So the stop data – the stop, as well as the GPS data, now communicated to the back end server? Answer: Yes." (May 14, 2018 Afternoon Session, Dkt. No. 541 at 168:5–11.) Similarly, Dr. Sharony testified that FedEx Express collected GPS data and transmitted it. (*Id.* at 168:14–19.) Dr. Sharony further confirmed that the devices used by FedEx

Ground and FedEx Express to perform these actions were the Star IV and PowerPad devices, respectively. (*Id.* at 169:7–13.)

Similarly, FedEx's representative, Mr. Smith, testified that the GPS data was received by an application server in Tennessee. (May 16, 2018 Morning Session, Dkt. No. 546 at 18–23.) While Mr. Smith also testifies that the GPS data is not sent to DWS or ROADS, (*see id.* at 66:8–67:17,) the Court's construction merely requires that the data get sent from the handheld device to some other device or server. (*See* Claim Construction Order, Dkt. No. 165 at 93.)

However, the plain language of the Court's construction, which states that the communication is between "the at least one handheld device and *other devices* or *the* server," (*Id.*,) could be construed by the jury to restrict the communications to those between the handheld device and either (a) other handheld devices or (b) the same geographically distant server from which the handheld device originally accessed the program data. The Parties agree that neither expert opined as to whether the "other devices" refers to other handheld devices or other electric devices writ large. (*See* Dkt. No. 561 at 18 ("Mr. Williams never stated that the 'other devices' referred to in claim 18 could not include other servers."); Dkt. No. 572 at 10 ("Dr. Sharony never stated that the 'other devices' could include anything other than other 'handheld devices' which are the only 'devices' in claim 18."); Dkt. No. 577 at 4 ("Dr. Sharony was not required to testify that 'other devices' are not handheld devices.").) Further, as mentioned above, Mr. Smith testified that the DWS and ROADS servers, which Plaintiff argues provides the program data, do not receive the GPS data.

Accordingly, the Court finds that a reasonable jury, reading the plain language of claim element [e], could have determined that the Star IV and PowerPad devices did not infringe claim element [e] and thus did not infringe independent Claim 18 or dependent Claim 20.

### B. **Validity of the '581 Patent**

IV argues that the FedEx Prior Art Systems are "a collection of unrelated devices and systems" and that FedEx failed to present evidence that any of those systems, whether treated as disparate or unified, disclosed or rendered obvious Claims 1, 18, and 20 of the '581 Patent, because Mr. Williams never identified an "assessment program" that was allegedly accessed by the handheld device. (Dkt. No. 561 at 20–21.) IV further argues that Mr. Williams never opined as to what field data was collected in response to this program, which FedEx system performed the step, or even whether such program was actually accessed by the handheld device. (*Id.* at 21.) IV next asserts that neither Mr. Williams nor Mr. Bailey, FedEx's fact witness on the FedEx Prior Art Systems, cited to a single document to support their contentions of public use. (*Id.* at 21–23.) Finally, IV argues that "FedEx never presented evidence analyzing the *Graham* factors or any evidence about who a skilled artisan would have combined FedEx's prior art references to arrive at the asserted claims or would have had a reasonable expectation of success in doing so." (*Id.* at 24.)

FedEx responds that it presented "substantial, unrebutted, evidence [sic] [that] supports a finding that the FedEx Prior Art . . . actually functioned as one system," with the various handheld systems communicating with the COSMOS and DADS systems. (Dkt. No. 572 at 11 (citing May 15, 2018 Afternoon Session, Dkt. No. 544 at 212:25–216:4, 223:4–225:17; May 16, 2018 Morning Session, Dkt. No. 546 at 7:4–17:3).) FedEx further argues that even if the Court determines that "each of the handhelds must perform every step, Mr. Williams analyzed claims 1, 18, and 20 against the DADS Handheld and its interaction with the COSMOS/DADS [system]." (*Id.* at 12 (citing May 16, 2018 Morning Session, Dkt. No. 546 at 122:22–136:14; May 16, 2018 Afternoon Session, Dkt. No. 547 at 3:23–9:9).) As to the assessment program, FedEx argues that Mr. Bailey testified that DADS was "software" that ran on a "computer" or "server" and that DADS sent

dispatch information to the courier, while Mr. Williams testified that DADS was a remote computing device that stored an assessment program that was accessed by the FedEx prior art systems. (*Id.* at 13 (citing May 15, 2018 Afternoon Session, Dkt. No. 544 at 212:3–213:5; May 16 2018 Morning Session, Dkt. No. 546 at 15:1–17:3, 123:3–21, 127:2–9, 132:5–18; DTX-100).) FedEx asserts that Mr. Williams testified that the collected field data was the barcodes that were scanned and the electronic signature data and showed how users "access[ed] online help screens and tutorials, as supported and explained by DTX-101 at 6." (*Id.* at 14–5 (citing May 16, 2018 Morning Session, Dkt. No. 546 at 123:22–124:16, 132:19–134:7).) As to the *Graham* factors, FedEx first argues that such factors do not apply because the FedEx Prior Art is one system, and argues second that "Mr. Williams testified that it 'would have been obvious to combine the prior art with – other prior art." (*Id.* at 17 (citing May 16, 2018 Morning Session, Dkt. No. 546 at 125:22–126:18).) Finally, FedEx argues that IV waived its arguments regarding the assessment program, field data, and actual access of the program by not raising them in their 50(a) motions.

IV replied that it did not waive any arguments, as it moved "for JMOL on obviousness for each of FedEx's grounds pursuant to Rule 50(a)." (Dkt. No. 577 at 5).

The Court addresses the waiver arguments first. In *Western Union Co. v. MoneyGram Payment Sys.*, the Federal Circuit addressed this situation.

> At the outset, [plaintiff] argues that [defendant] has waived its right to appeal several issues including obviousness of the asserted patent claims based on the Orlandi Valuta system in combination a keypad. It argues that the district court properly found this argument waived below because [defendant] failed to specifically raise obviousness based on a keypad device in its Rule 50(a) motion and that omission ran afoul of the purpose of Rule 50. Therefore, [defendant] contends, [plaintiff] cannot attempt to incorporate new prior art arguments on appeal.
>
> We disagree and decide that the district court erred in concluding that [defendant] had waived its obviousness argument specifically as it related to Orlandi Valuta. Rule 50(a) requires that a motion for judgment as a matter of law 'must specify the judgment sought and the law and facts that entitle the movant to the judgment.'

> Fed. R. Civ. P. 50(a)(2). We have held that even a cursory motion suffices to preserve an issue on JMOL so long as it "serves the purposes of Rule 50(a), *i.e.*, to alert the court to the party's legal position and to put the opposing party on notice of the moving party's position as to the insufficiency of the evidence." *Blackboard, Inc. v. Desire2Learn, Inc.*, 574 F.3d 1371, 1379–80 (Fed. Cir. 2009). Fifth Circuit law, applicable here, also construes the rule liberally, excusing 'technical noncompliance' when the purposes of the rule are satisfied. *Navigant Consulting, Inc. v. Wilkinson*, 508 F.3d 277, 288–89 (5th Cir. 2007). Applying that liberal standard, we find no waiver here. [Defendant] argued in its Rule 50(a) motion that it was entitled to JMOL on obviousness on all asserted claims of all asserted patents, specifically listing Orlandi Valuta as prior art that rendered the claims obvious. We agree with [defendant] that those statements were sufficient to preserve [defendant's] obviousness arguments as to Orlandi Valuta.

*Western Union*, 626 F.3d 1361, 1367–68 (Fed. Cir. 2010).

Here, Plaintiff's counsel enumerated several grounds under 50(a) that Plaintiff believed constituted a failure of proof on the part of Defendant, including that the FedEx Prior Art did not determine its own location, as required by Claim 1, the assorted FedEx Prior Art systems "were unable to actually get the manifest instructions from the back end server," as required by the "accessing an assessment program" limitation, that the DADS device was publicly available, and that Defendant never presented an anticipation case.

Construing Plaintiff's Rule 50(a) motions liberally, the Court finds that Plaintiff's 50(a) motion that each of the FedEx Prior Art handheld systems "were unable to actually get the manifest instructions" was sufficient to put FedEx on notice as to Plaintiff's belief that Defendants had failed to properly show the "assessment program" element, as such an element is required to actually get the instructions, that Defendant had failed to identify what field data was collected in response to such program, or that any program accessed by the FedEx Prior Art systems was more than a database. Accordingly, the Court holds that Plaintiff's JMOLs on such topics were not waived.

As to the assessment program, Mr. Williams testified about the assessment program in two places:

Q. And can you give an example of one of those remote computing devices?

A. The COSMOS system and the DADS system.

Q. And did the computing device store an assessment program?

A. Yes , it did.

. . .

Q. In your opinion, does -- did the FedEx prior art systems perform the function as the Court construed it of accessing a program that is stored at the server to enable an assessment at the field using the at least one handheld device wherein accessing a program requires more than accessing a database storing data?

A. Yes.

Q. And, again, sir, can you just explain with reference to Figure 1 [of the '641 Patent, DTX-100] how that function would be accomplished?

A. The -- as shown here, the example is that the DADS handheld or the SuperTracker, Enhanced SuperTracker in combination with the DADS terminal, either one of them would communicate and access a program stored in the -- in COSMOS, and utilize – utilize that program to then collect field data afterwards.

(May 16, 2018 Morning Session, Dkt. No. 546 at 123:9–14, 132:5–18.)

In the absence of any rebuttal case, the Court finds that Mr. Williams' testimony provided the only evidence with regards to whether the FedEx Prior Art systems stored an assessment program on a remote computing device, as required by Claim 1, or "access[ed] a program stored at the server to enable an assessment at the field using the at least one handheld device," as required by Claim 18. *See also Metaswitch Networks Ltd. v. Genband US LLC*, 2017 U.S. Dist. LEXIS 137926 at *54 (E.D. Tex. Aug. 28, 2017) ("Metaswitch did not call any validity expert at trial to rebut Mr. Stillerman's testimony. It is the jury's role to weigh the evidence presented and judge the credibility of the witnesses. A reasonable jury could have concluded that Gregory disclosed the "gateway device" as required by Claims 1 and 2 of the '282 Patent based on Mr. Stillerman's testimony.").

Similarly, Mr. Williams testified that "the FedEx handheld devices [were] used to collect field data associated with the field assessment using the handheld device in response to the assessment program." (*Id.* at 123:22–25.) As there was no rebuttal to Mr. Williams testimony, the Court finds that there is sufficient evidence for a reasonable jury to find that the FedEx Prior Art systems performed the "field data" claim element.

As to the requirement that the handhelds access a program, Mr. Williams testified that the "means for accessing a program stored at the server to enable an assessment at the field using the at least one handheld device . . . as the Court construed it of accessing a program that is stored at the server to enable an assessment at the field using the at least one handheld device wherein accessing a program requires more than accessing a database storing data." (*Id.* at 131:23–132:10.) Mr. Williams further testified that "the DADS handheld or the SuperTracker, Enhanced SuperTracker in combination with the DADS terminal, either one of them would communicate and access a program stored in the -- in COSMOS, and utilize -- utilize that program to then collect field data afterwards." Accordingly, as there is no rebuttal expert testimony, the Court finds that a reasonable jury could have found that FedEx Prior Art systems formed one unified system with several types of handhelds accessing one network and that such handhelds accessed a program, as required by Claims 18 and 20.

As to public availability, Mr. Bailey cites to four documents to corroborate his testimony that the DADS handheld, and by proxy, the entire associated FedEx Prior Art System, were in public use prior to the priority date of the ' 581 Patent, including a draft version of the DADS Handheld manual from 1995, (DTX-101,) a 2016 online timeline of FedEx achievements, (DTX-36,) the '642 Patent, and a 2015 DWS Overview document that describes the DADS and COSMOS systems, as well as their public rollout in 1986. (DTX-406.) While the 1995 Document

is a draft, such draft is in an apparently final form and is sufficiently detailed to corroborate Mr. Bailey's testimony. Further, while the timeline and DWS overview were not created contemporaneously with the rollout, such documents were created prior to the filing of the Complaint, and thus could be found credible. *See Juicy Whip v. Orange Bang*, 292 F.3d 728, 743 (Fed. Cir. 2002) (finding that "[r]eliable evidence of corroboration preferably comes in the form of physical records that were made contemporaneously with the alleged invention," as documents generated post-complaint are no better than biased oral testimony). Accordingly, there is sufficient corroborating evidence to support Mr. Bailey's testimony that the DADS handhelds were used in public.

Finally, as to the *Graham* factors, Mr. Williams testified both that the "FedEx prior art makes the claims obvious, in my opinion," that it would have been obvious to incorporate "geographical location data via GPS" with "the FedEx prior art," and that "it would have been obvious to take Gildea's GPS and incorporate it into the FedEx handheld devices." (May 16, 2018 Morning Session, Dkt. No. 546 at 121:16–20, 125:22–126:3, 126:15–18.) Mr. Williams further testifies that "the FedEx prior art in combination with Gildea and Khalessi teach all of the steps of Figure 9 of the '581 patent in combination with the accompanying references in the specification," that it "would be obvious to – to do those Figure 5 steps of Khalessi in a loop," and that "Claims 1, 18, and 20, are [invalid] in view of the FedEx prior art systems, in combination with references such as Stephenson, Gildea, and Khalessi." (May 16, 2018 Afternoon Session, Dkt. No. 547 at 9:1–9, 12:1–5.) As IV presented no rebuttal testimony, a reasonable jury was faced with only Mr. Williams' testimony and could reasonably have found that it would have been obvious for a person of skill in the art to incorporate the GPS teachings of Gildea into the FedEx Prior Art, including the '642 Patent.

As the Court has found that a reasonable jury could have found for FedEx on each of Plaintiff's objected-to grounds, the Court finds that a reasonable jury could have properly found the Asserted Claims of the '581 Patent to be invalid.

## C. Validity of the '356 Patent

IV argues that JMOL is warranted as to the '356 Patent because Dr. Rhyne failed "to present any evidence that a skilled artisan would have been motived to combine Bowers (U.S. Patent No. 5,963,134) and Muhme (U.S. Patent No. 5,886,634) . . . or would have had reasonable success in doing so." (Dkt. No. 561 at 26.) IV further argues that Dr. Rhyne "admitted on cross-examination that neither Bowers nor Muhme disclosed the final element [of 'wherein at least one of the objects is automatically returned or picked up as a result of such notification]." (*Id.* at 27 (citing May 17, 2018 Morning Session, Dkt. No. 548 at 125:23–126:10).)

FedEx responds that Dr. Rhyne testified "that a skilled artisan would have combined Bowers and Muhme because both references are in the same field, utilize RFID technology, and describe applications of tracking objects in a secured space," and then described how a skilled artisan would have combined the references. (Dkt. No. 572 at 18 (citing May 17, 2018 Morning Session, Dkt. No. 548 at 79:2–88:18).) Dr. Rhyne further disclosed the "automatically" limitation when he disclosed that, using Plaintiff's "interpretation of the Court's constructions, Bowers and Muhme disclosed this limitation by automatically generating a reshelving report." (Dkt. No. 580 at 6; *see also* May 17, 2018 Morning Session, Dkt. No. 548 at 86:15–88:12.)

Bowers describes an "inventory control system for articles, such as books, [that] uses RFID tags attached to each article," Bowers at abstract, while Muhme describes "[a] security system [that] includes a base station that reads a first tag and a second tag, . . . [then] determines whether the removal of the [tagged] items, persons, and/or containers is authorized. If the removal is not authorized, the base station may activate an alarm, lock the exit, and/or generate a message for

delivery to a remote site. The security system may also be integrated with an inventory control system to monitor the location and status of the items, persons, and/or containers." Muhme at abstract.

Upon being asked "whether a person of ordinary skill in the art would combine [Bowers and Muhme," Dr. Rhyne explicitly testified that "[t]hey both deal with inventory and trying to provide ways of tracking the movement of inventory within a secure facility, and they -- each of them has their own unique description of additional features that collectively, when you put them together, you end up with everything that's in the claim that's asserted of the '356 patent." (May 17, 2018 Morning Session, Dkt. No. 548 at 78:24–79:7.) While Dr. Rhyne did not use the magic words proclaiming that a skilled artisan would have combined Bowers and Muhme, such a conclusion is implicit in Dr. Rhyne's testimony in response to Defense counsel's question about combination and was reinforced when Dr. Rhyne further testified that "[he] consider[ed] the -- Claim 1 [to be] the teachings of Bowers and Muhme." (*Id.* at 79:8–15.) In light of the absence of a rebuttal case, the Court finds that a reasonable jury could have found that a person of skill in the art would have been motivated to combine Bowers and Muhme.

As to the reasonable likelihood of success, Defense counsel asked Dr. Rhyne how "a person of ordinary skill would combine Bowers and Muhme." Dr. Rhyne then detailed how both references were "directed to secured locations where they have inventory control," and that

> Muhme discloses with the man, the article, the locked door, the base station, and a remote site. If you think about combining those teachings -- and I've kind of animated it here -- you could see you would have the sensors -- the readers associated with exit locations. And Bowers would correspond to the base station that's taught in Muhme and its link to a remote site.
>
> So with that capability, I've added, by combining Muhme and Bowers, having a link back to a remote site which is where the security personnel would be, and they would come and take care of a situation where somebody's trying to exit -- exit inappropriately.

(*Id.* at 86:15–87:5.)

Thus, Dr. Rhyne not only opined that it would be obvious to combine Bowers and Muhme, but illustrated how combining the Bowers inventory technology with Muhme's security system for determining whether the removal of tagged items from an area would provide an improved, working security system for items tagged by RFID chips. In light of the absence of a rebuttal case, the Court finds that a reasonable jury could find that a person of skill in the art would expect to be able to combine Bowers and Muhme.

Finally, with respect to the "automatically returned" claim element, Dr. Rhyne testified that Muhme "discloses [the element] wherein at least one of the objects is automatically picked up and returned as a result of the notification. This says that people are going to respond and investigate, and I believe that implies that they would go and find out what's happening." (May 17, 2018 Morning Session, Dkt. No. 548 at 87:10–18.) Dr. Rhyne further testified that Bowers disclosed the limitation by describing "what's called a reshelving report. . . . This is an automatically generated report to tell [librarians] what to do. And what it says is go to this location, you're going to reshelve an article, like a book, Captains of Consciousness, which has this tag number, and it will tell you where to put it. So that is automatically returning based on this reshelving report." (*Id.* at 87:23–88:9.) Accordingly, as Dr. Rhyne testified that the combination of Bowers and Muhme performed the "automatically returning" element and Plaintiff did not put on a rebuttal case, the Court finds that a reasonable jury could have found that the "automatically returning" claim element was performed by the combination of Bowers and Muhme.

As a reasonable jury could have found that a person of skill in the art would have combined Bowers and Muhme, and that such combination teaches every element of the Claim 1 of the '356 Patent, the Court **DENIES** the Motion as to invalidity of the '356 Patent.

### D. **IPR Estoppel**

After completion of the briefing, the PTAB issued final written decisions in IPRs covering the '581 and '586 Patents, wherein the PTAB found Claims 1–17 of the '581 Patent invalid as obvious, Claims 18–24 of the '581 Patent not invalid, claims 7, 8, 12 and 13 of the '586 Patent invalid as obvious, and Claims 16, 18, and 19 of the '586 Patent not invalid. (Dkt. No. 589 at 2, 3.)

IV now asserts that, under 35 U.S.C. § 315(e)(2), "FedEx is estopped from asserting in this litigation that [the not invalid] claims are invalid on any ground that FedEx 'raised or reasonably could have raised' in its IPR petitions." (Dkt. No. 589 at 4.) IV further asserts that such estoppel "takes effect immediately and applies to every invalidity challenge FedEx asserts against the '581 and '586 Patents." (*Id.* at 4–5.) In order to support such a proclamation, IV analogizes such estoppel to "a final judgment of invalidity[, which] 'has an immediate issue-preclusive effect on any pending or co-pending actions involving the patent' at any stage of a litigation, including during appeal after a jury verdict." (*Id.* at 5 n.2 (citing *XY, LLC v. Trans Ova Genetics, L.C.*, 890 F.3d 1282, 1294 (Fed. Cir. 2018); *Soverain Software LLC v. Victoria's Secret Direct Brand Mgmt., LLC*, 778 F.3d 1311, 1315 (Fed. Cir. 2015) ("It is also established that issue preclusion applies even though the precluding judgment comes into existence while the case as to which preclusion is sought is on appeal.").)

Section 315(e)(2) states:

> The petitioner in an inter partes review of a claim in a patent under this chapter that results in a final written decision under section 318(a), or the real party in interest or privy of the petitioner, may not assert either in a civil action arising in whole or in part under section 1338 of title 28 or in a proceeding before the International Trade Commission under section 337 of the Tariff Act of 1930 that the claim is invalid on any ground that the petitioner raised or reasonably could have raised during that inter partes review.

The Court finds that Section 315(e)(2) no longer applies to this case. The plain language of the statutes states that defendants may not assert claims that may have been raised before the PTAB. However, this Court entered final judgment as to all validity claims on May 21, 2018. At that point, Defendants cease to "assert" their invalidity-based defenses and counterclaims; instead, the jury's verdict of invalidity became that of the Court. Further, the Court finds that the correct application of IV's analogy is that the Court's judgment invalidating the '581 and '586 Patents should be the governing law of the land, despite the PTAB's faster post-verdict certification. Accordingly, the Court **DENIES** IV's post-briefing motion to estop Defendants from asserting any invalidity bases that they raised or could have raised before the PTAB.

### E. <u>New Trial</u>

Finally, IV asserts that FedEx presented its case in such a confusing manner as to justify a new trial. (Dkt. No. 561 at 28–35.) IV asserts that FedEx's experts "ignored the Court's constructions," (*id.* at 28,) ignored facts that had been "proven earlier in the case," (*id.* at 29,) conducted inappropriate attorney argument, (*id.*,) and repeatedly violated the Court's orders. (*Id.* at 30.)

FedEx responds that, while "[n]o trial is perfect[,] IV did . . . receive a fair trial." (Dkt. No. 572 at 29.) FedEx asserts that IV should have objected at trial if it believed that FedEx's experts were testifying inappropriately. Further, the jurors had the benefit of both Parties' expert testimony and the contents of their juror notebooks, including the language of the claims themselves and the Court's claim constructions. (*Id.* at 30.)

The Court finds that to the extent any objections were not raised at trial, such objections are now waived, and where the Court addressed such objection, no prejudice ensued. The Court further finds that FedEx presented evidence consistent with its infringement and invalidity positions. While FedEx could have presented its evidence in a more optimal manner, such is

always the case for every party in every trial, especially where the trial includes complicated concepts and technologies. Accordingly, the Court finds that FedEx's presentation of its case was not so confused or prejudicial as to justify a new trial. The Court does not grant a new trial.

### IV.    <u>CONCLUSION</u>

For the reasons set forth above, the Court finds no compelling basis upon which the jury's verdict with regard to liability or invalidity should be disturbed. Though permitted when the elevated demands of Federal Rule of Civil Procedure 50 are clearly met, Courts should always tread lightly and carefully when asked to disregard the considered decision of a properly empaneled jury, especially when considered within the context of the constitutional guarantees of the Seventh Amendment.

The Jury's verdict in this case is supported by adequate evidence presented at trial, and should stand unchanged. Accordingly, IV's Rule 50(b) Motion for Judgment as a Matter of Law (Dkt. No. 561) is **DENIED** in all respects.

**So Ordered this**
**Mar 29, 2019**

RODNEY GILSTRAP
UNITED STATES DISTRICT JUDGE